Docket No. 24-5185

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

---

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**v.**

**DAEKUN CHO,**

**Defendant-Appellant.**

---

On Appeal from the Judgment and Conviction in
District Court Case No. 23-cr-149-FLA
In the United States District Court for
the Central District of California
(Hon. Fernando L. Aenlle-Rocha, U.S. District Judge, Presiding)

# BRIEF OF APPELLANT

KAREN L. LANDAU, CSB # 128728
Law Office of Karen L. Landau
1966 Tice Valley Blvd., #189
Walnut Creek, CA 94595-2203
(510) 501-2781
Attorney for Appellant
Daekun Cho

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iv

I. JURISDICTION AND TIMELINESS .......... 1

II. CUSTODY STATUS .......... 1

III. ISSUES PRESENTED FOR REVIEW .......... 1

IV. STATEMENT OF THE CASE .......... 2

1. Procedural History .......... 2

2. Statement of Facts .......... 4

3. The Defense Theory .......... 11

4. Facts Relevant to Sentencing .......... 12

V. SUMMARY OF ARGUMENT .......... 13

VI. ARGUMENT .......... 14

A. The District Court Prejudicially Erred in Admitting Evidence of Uncharged Acts and Criminal Street Gang Affiliation. .......... 14

1. Standard of Review .......... 14

2. Background .......... 14

a. The Uncharged Shooting .......... 14

b. The Gang Evidence .......... 17

3. The District Court Abused Its Discretion In Admitting Evidence Of the Uncharged Shooting. .......... 19

4. The District Court Abused its Discretion in Admitting Evidence about the Grape Street Crips and Mr. Cho's Alleged Affiliation........25

5. The Court's Errors Prejudiced the Defense....................................31

B. The District Court Erred in Disallowing Significant Cross-Examination. .....................................................................................33

1. Standard of Review ........................................................................33

2. The Court Erroneously Sustained Multiple Hearsay Objections To Statements That Were Admissible, Because They Were Not Offered For Their Truth..............................................................................33

C. The District Court Procedurally Erred by Imposing a Two-Level Upward Adjustment for Vulnerable Victim. ..........................................36

VII. CONCLUSION..............................................................................43

STATEMENT OF RELATED CASES ...................................................44

CERTIFICATE OF COMPLIANCE......................................................45

# TABLE OF AUTHORITIES

Supreme Court Cases

*Anderson v. United States,* 417 U.S. 211 (1974) .................................... 35

*United States v. Abel*, 469 U.S. 45 (1984) .................................. 25, 27, 30

Federal Circuit Cases

*Mitchell v. Prunty*, 107 F.3d 1337 (9th Cir. 1997) *overruled on other grounds by Santamaria v. Horsley*, 133 F.3d 1242 (9th Cir. 1998) .... 27

*United States v. Alfonso,* 759 F.2d 728 (9th Cir. 1985) .................... 20, 21

*United States v. Arambula-Ruiz,* 987 F.2d 599 (9th Cir. 1993) ............ 24

*United States v. Ayers,* 924 F.2d 1468 (9th Cir. 1991) ........................... 20

*United States v. Backman,* 817 F.3d 662 (9th Cir. 2016) ........................ 37

*United States v. Box*, 50 F.3d 345 (5th Cir. 1995) ................................. 39

*United States v. Bradley,* 5 F.3d 1317 (9th Cir. 1993) ...................... 20, 24

*United States v. Brooke*, 4 F.3d 1480 (9th Cir. 1993) ............................. 22

*United States v. Castaneda*, 239 F.3d 980 (9th Cir. 2001) ...................... 37

*United States v. Castellanos,* 81 F.3d 108 (9th Cir. 1996) ........... 36, 39, 40

*United States v. Easter*, 66 F.3d 1018 (9th Cir. 1995) ............................ 27

*United States v. Ellis,* 147 F.3d 1131 (9th Cir. 1998) ............................ 21

*United States v. Garcia*, 151 F.3d 1243 (9th Cir. 1998) ................... 20, 27

*United States v. Garcia-Orozco,* 997 F.2d 1302 (9th Cir. 1993) ............ 20

*United States v. Gomez,* 6 F.4th 992 (9th Cir. 2021) .............................. 26

*United States v. Gonzalez-Flores,* 418 F.3d 1093 (9th Cir. 2005).... 21, 22, 24

*United States v. Hankey*, 203 F.3d 1160 (9th Cir. 2000) .................. 25, 26

*United States v. Hill,* 645 F.3d 900 (7th Cir. 2011) ................................ 42

*United States v. Hodges,* 770 F.2d 147, (9th Cir. 1985) .................... 20, 21

*United States v. Holmes,* 129 F.4th 636 (9th Cir. 2025) ......................... 14

*United States v. Lopez-Alvarez*, 970 F.2d 583 (9th Cir. 1992) ................ 35

*United States v. Luca,* 183 F.3d 1018 (9th Cir. 1999) ...................... 40, 41

*United States v. Luna,* 21 F.3d 874 (9th Cir. 1994) ............................... 24

*United States v. Marguet-Pillado*, 560 F.3d 1078 (9th Cir. 2009) .......... 33

*United States v. Mayans,* 17 F.3d 1174 (9th Cir. 1994) .................... 21, 23

*United States v. Mendoza,* 262 F.3d 957 (9th Cir. 2001) ......................... 40

*United States v. Peters,* 962 F.2d 1410 (9th Cir. 1992) ........................... 37

*United States v. Rios,* 830 F.3d 403 (6th Cir. 2016) .............................. 26

*United States v. Robinson*, 978 F.2d 1554 (10th Cir.1992) ..................... 26

*United States v. Rodriguez,* 766 F.3d 970 (9th Cir. 2014) ................ 26, 30

*United States v. Schram,* 746 Fed. Appx. 688 (9th Cir. 2018) ............... 24

*United States v. Shyllon,* 10 F.3d 1 (D.C. Cir. 1993) .............................. 42

*United States v. Solorza,* 470 Fed. Appx. 669 (9th Cir. 2012) ................ 42

*United States v. Takahashi*, 205 F.3d 1161 (9th Cir. 2000) .............. 25, 27

*United States v. Veerapol,* 312 F.3d 1128 (9th Cir. 2002) ....................... 42

*United States v. Yeagin,* 927 F.2d 798 (5th Cir. 1991) .......................... 20

Statutes

18 U.S.C. § 3231 ................................................................................ 1

28 U.S.C. § 1291 ................................................................................ 1

U.S.S.G. § 3A1.1(b)(1) ........................................................................ 36

Rules

Fed. R. App. P. 4(b) ............................................................................ 1

Fed. R. Evid. 403 ......................................................................... passim

Fed. R. Evid. 404(b) ..................................................................... passim

Fed. R. Evid. 801(c)(2) ........................................................................ 35

# I. JURISDICTION AND TIMELINESS

This is an appeal from the judgment and commitment order issued by the district court on August 19, 2024. 1-ER-2. Appellant filed a timely notice of appeal on August 21, 2024. 4-ER-899. See Fed. R. App. P. 4(b).

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. The district court had jurisdiction pursuant to 18 U.S.C. § 3231.

# II. CUSTODY STATUS

Appellant Cho is serving his 270-month sentence of imprisonment. His anticipated release date is May 18, 2042.

# III. ISSUES PRESENTED FOR REVIEW

1. Did the district court prejudicially err by in admitting evidence in violation of Fed. R. Evid. 403 and Fed. R. Evid. 404(b), namely evidence of an uncharged shooting and evidence that Mr. Cho was associated with the Grape Street gang?

2. Did the district court prejudicially err when it excluded certain cross-examination on the grounds that it called for hearsay?

3. Whether the district court procedurally erred by concluding that the victims were vulnerable.

# IV. STATEMENT OF THE CASE

*A. Procedural History*

On March 29, 2023, a federal grand jury sitting in the Central District of California returned an indictment against defendant Daekun Cho, charging him with multiple counts of interference with interstate commerce by extortion. 4-ER-889-98. On March 1, 2024, the grand jury returned a superseding indictment. 4-ER-877. Counts 1 and 2 alleged that on or about November 16 and December 19, 2020, Mr. Cho knowingly and with intent to obtain property, affected interstate commerce by committing extortion: namely by obtaining money from victim Y.S. by means of threatened force, violence, and fear of injury to the victim and his business, in violation of 18 U.S.C. § 1951(a).[1] 4-ER-877-78. Counts 3 and 4 alleged identical counts of interference with interstate commerce by extortion, occurring on January 12 and February 15, 2021, directed toward victim J.L. 4-ER-879. Counts 5-32

---

[1] The persons named by initial in the indictment, all adult witnesses, testified at trial. Y.S. is You Soo Shin (Counts 3-4 and 57), J.L. is Joo Hun Lee (Counts 1-2), S.S. is Sang Heun Shin (Counts 5-32 and 56), K.Y.J. is Ki Young Jung (Counts 33-39), and Y.K is Young Nae Kang (Counts 40-55).

alleged additional substantive extortion charges occurring between December 17, 2020, and March 16, 2023, with respect to victim S.S., the manager of hostesses catering to karaoke bars, in violation of *id.* 4-ER-880-81. Counts 33-39 alleged substantive counts of interference with interstate commerce by extortion occurring between December 7, 2020 and May 5, 2021, with respect to victim K.Y.J., alleged to be the manager of a karaoke bar, in violation of *id.* 4-ER-882. Counts 40-55 alleged substantive extortion charges as to victim Y.K. and his business, occurring between March 1, 2022, and March 15, 2023, in violation of *id.* 4-ER-883. Count 56 alleged that on or about February 16, 2023, Cho attempted to interfere with interstate commerce in violation of § 1951(a), as to victim S.S. 4-ER-884. Finally, count 57 alleged that on or about May 8, 2021, Mr. Cho and others, knowingly and intentionally, and with the intent to cause death and serious bodily harm, took a motor vehicle from the person or presence of Y.S. by force, violence and intimidation, resulting in serious bodily injury, in violation of 18 U.S.C. §§ 2119(2), 2(a). 4-ER-885. The indictment also contained two forfeiture allegations.

The case was tried to a jury between March 19, 2024 and March 26, 2024, on which day the jury convicted Mr. Cho as charged.

On August 16, 2024, the district court sentenced Mr. Cho to 270 months' imprisonment and a five-year term of supervised release. 1-ER-2. The court imposed a 240-month sentence – the statutory maximum – on each extortion count, and a 270-month sentence on the carjacking charge, with all terms to run concurrent. Mr. Cho filed a timely notice of appeal. 4-ER-899.

### *B. Statement of Facts*

The government presented evidence that Mr. Cho extorted various persons connected with Korean karaoke clubs: club owners and "doumi" drivers. "Doumis" are young women who travel to karaoke clubs and bars to entertain mail customers. Doumis, also known as hostesses, are paid by male customers to spend time with them. A group of men work as their drivers, transporting them to various clubs and bars, located in the Koreatown district of Los Angeles.  Clubs and bars contacted doumi drivers to supply girls, using Kakao, a Korean language messaging application. 2-ER-325, 448.

Doumis paid their drivers on an hourly basis, $20 or $40 per hour. 2-ER-323, 446.[2] The drivers were paid their hourly rate if the doumis worked, regardless of what the women earned. *Id.* If the doumis were unsuccessful in obtaining employment for the evening, the drivers were not paid either. *Id.*

Supplying women to clubs was a competitive business: there were too many doumi drivers to count. 2-ER-361. If another driver had been at a club earlier, it was unlikely that the driver's women would be employed. 2-ER-354-55, 447. Mr. Cho attempted to coordinate the drivers, hosting the Kakao group. 2-ER-448. For example, Cho told drivers to go stay away from certain clubs. 2-ER-447-47.

The drivers exercised control over the doumis' behavior, issuing rules, prohibiting them from drug use or engaging in paid sex, and requiring them to work a certain number of evenings per week. 2-ER-355, 357.

---

[2] Joo Hun Lee and You Shin, who were partners, contradicted each other's testimony about driver payment. Lee testified that drivers earned $40/hour for each hour a woman worked, while Shin testified the drivers earned $20. 2-ER-323, 446.

The government showed that various doumi drivers paid Mr. Cho monthly amounts of $100-$200, usually via VENMO, but sometimes in cash. Ki Young Jung, a club manager, paid Mr. Cho monthly in increments of $400-500. 3-ER-515. The testifying drivers, Joo Hun Lee, Yun Soo Shin, Sang Heun Shin, and Young Nae Kang said that Mr. Cho did not provide them with any services in exchange for the payments, but warned them that there would be consequences if they did not pay. *E.g.,* 3-ER-470-71. Young Nae Kang testified that he started paying Cho in order to work. 2-ER-465. Sang Heun Shin said he paid Cho for protection and then because he feared Cho would ban him from the studios and prevent him from earning income. 3-ER-542-43.

The government presented numerous messages between Mr. Cho and the drivers. The messages consisted primarily of Mr. Cho telling the drivers that monies were due, and the drivers responding. *E.g.,* 3-ER-543-44. In some messages, however, Mr. Cho warned drivers about late payments, the failure to pay, or imposing a penalty payment for a rules violation, such as taking girls to a banned club. *E.g.,* 3-ER-547.

Mr. Cho directed drivers to take girls to some clubs but not others. If he learned that drivers were patronizing clubs that were off limits, he

would impose a financial penalty. Sometimes, he threatened to harm the drivers, warning them that they did not want to "see the demon." 3-ER-474.

Kang and Sang Shin both feared Cho. Kang said he had previously seen Cho beat someone at a club and he paid Cho because he was fearful. 3-ER-476. Sang Shin said that in January, 2023, Cho punched him and took money from his wallet. 3-ER-548-49. Over objection, the court allowed Shin to testify that he had heard Cho had friends fire a gun. 3-ER-550.

Jung, the club manager, claimed that he started paying Cho because he threatened that if he did not pay, the club would lose business and he would physically harm "them." 3-ER-514-15. Jung said that Cho also directed him to ban certain drivers from his club, warning him that if he accepted them, Cho would try to shut down the club and harm its staff. 3-ER-516. Jung said that Cho was rumored to be in a Black gang, Grape Street. *Id.* Nonetheless, Jung stopped paying Cho in May, 2021, but Cho never assaulted him. 3-ER-535. Young claimed that Cho assaulted him "over the phone" and through text messages. *Id.*

One driver, Yun Soo Shin, was violently assaulted. He identified that Cho was one of his assailants. Shin and his partner, Joo Hun Lee, had paid Cho for a period of time, having been told it was required to work as a doumi driver. 2-ER-326-27. Lee said that Cho claimed to be a Korean gangster. 2-ER-329, 331. Lee and his partner Shin stopped paying Cho around December 2020, when Cho asked them to pay more. 2-ER-331-32.

In April, 2021, after Lee stopped paying, he asked to meet with Cho. 2-ER-452-54. Shin met with Cho and recorded their meeting. 2-ER-454-55. During the conversation, Cho asked Shin "why are you looking at me like that, bro?." 2-ER-455-56. Shin asserted he thought Cho wanted to start a fight and asked Cho if he was going to hit him. 2-ER-456. Cho said yeah okay, and Shin invited him, "come on." *Id.* Cho denied that he was going to hit Shin and asked what was wrong with him. *Id.* Shin asked if Cho was threatening him and Cho said no. 2-ER-457. Shin did not promise to start paying Cho again and said instead that he was not going to pay him anymore. *Id.*

After this meeting, Lee sent another text to Cho saying they needed to meet. 2-ER-457. Lee and Shin had agreed that if they

obtained another meeting with Cho, they would call the police and attempt to set him up. 2-ER-458.

Subsequently, on May 8, 2021, Cho and another man beat Yun Shin. 2-ER-334-35, 410-11, 413-15. Lee overheard part of the assault over the phone. 2-ER-334-35. The video assault was captured on a security camera and played for the jury. 2-ER-412-15. The video showed two masked men beating Shin. Then, they left the scene. After the assault, Shin got up and went into the club. 2-ER-415. About 90 seconds later, an unidentified man stole the Honda Odyssey van that Shin had been driving. The van was a rental and was recovered within 24 hours. 2-ER-421-22. Cho was not the person who stole the van, but the government charged the theft as a carjacking related to the assault.

At trial, Shin claimed that Cho and an African-American male were the assailants who beat him with baseball bats. 2-ER-416-17. Shin claimed that, although the men were masked, he could recognize Cho's eyes. 2-ER-416, 422.[3] He asserted that when he was at the hospital he

[3] Shin reluctantly agreed that one could not tell the race of the male attackers from the video. 2-ER-436-37. He said Cho was wearing shorts, and admitted the attacker appeared to have bare legs. 2-ER-435-36. Cho has extensive tattoos on his legs. 3-ER-634.

told Los Angeles Police Department officers that he had been attacked by two men, one black and one Korean or Asian. 2-ER-431-32. Immediately after the attack, however, Shin told police that two Black males had assaulted him. 3-ER-733.

After the assault, Jun Lee showed Yun Shin a photograph of Mr. Cho wearing a mask similar to the one worn by one of the assailants. 2-ER-337-38, 421. Three similar masks, two of which were brand new in the package, were found in a search of Cho's house. 3-ER-647-48, 716-17.

Over objection, the government presented expert testimony about the Grape Street Crips, a large street gang based in Watts. 3-ER-617-19. LAPD officer Jacob Rice testified that the Grape Street Crips earned money through robberies, drugs, extortion, burglaries and tax fraud. 3-ER-619-20. He asserted he had never seen a non-Grape St. Crips member wearing colors and using their symbols either in gang territory or in photos. 3-ER-624. To do so without being a member would be considered a sign of disrespect. 3-ER-624-25. Rice identified "Baby Loc" and "Peda Roll Mafia" as sets within Grape St., Crips. 3-ER-625-26. The government then introduced multiple photographs showing Mr.

Cho in the company of a number of persons who appeared to be Grape Street gang members, wearing purple and throwing various hand signs. 4-ER-570-76. One photograph showed Cho with a small group of African-American men; a banner reading "PRM" had been superimposed on the photo. 4-ER-871. Cho appeared to be throwing a hand sign. *Id.* Rice also testified about Mr. Cho's tattoos, which were associated with Grape Street and Peda Roll Mafia. 3-ER-634-36.

### *C. The Defense Theory*

The defense attempted to show that Mr. Cho had tried to organize the doumi driving business, and that payments were for participating in an organization, rather than extortion. 4-ER-808-09. For example, the defense sought to elicit testimony that the drivers had received text messages relaying information about clubs that were to be raided, or girls who should not be employed. 2-ER-470, 3-ER-494-96. The defense also sought to elicit testimony about the banning practices in the karaoke industry. *E.g.,* 4-ER-806-07. The defense also impeached the government's witnesses, all of whom had received immigration benefits

from the government in the form of U visas and many of whom testified evasively. *E.g.*, 2-ER-349-50; 4-ER-804, 809-10, 813.[4]

### *D. Facts Relevant to Sentencing*

The probation officer calculated the sentencing guidelines separately for each offense. Overall, the probation officer recommended that the base offense level was 20, premised on the carjacking conviction. PSR at 47. The probation officer recommended a total of 10 levels in upward adjustments based upon specific offense characteristics. These included a four-level upward adjustment for the infliction of serious bodily injury, four levels for the use of a dangerous weapon (a metal baseball bat), and a two-level upward adjustment for vulnerable victim. PSR at 47-48. The adjusted offense level was 34. The probation officer also calculated in upward adjustment for multiple counts which added one level for final adjusted offense level of 35. PSR at 49.

[4] For example, Lee attempted to minimize the significance of immigration benefits he received, but ultimately admitted he benefited by being allowed to remain indefinitely in the United States. 2-ER-349-50.

Mr. Cho lacked a significant criminal history. He fell into Criminal History Category I and the corresponding guideline range was 168-210 months.

The government sought a sentence of 300 months' imprisonment based on what it termed extreme conduct, and conduct that was not accounted for in the charged offenses.

The district court imposed a sentence of 270 months' imprisonment which represented a substantial variation upward from the high end of the sentencing guidelines.

## V. SUMMARY OF ARGUMENT

The district court admitted unfairly prejudicial evidence of little probative value. The evidence that Cho committed an uncharged shooting was far more prejudicial than the evidence the government introduced regarding the charges. The court's admission of irrelevant gang affiliation evidence added to the prejudice. This Court should reverse Mr. Cho's convictions.

Additionally, the district court procedurally erred in its calculation of the sentencing guidelines, mistakenly imposing a two-

level upward adjustment for a vulnerable victim. This error requires reversal of the sentence and a remand for resentencing.

# VI. ARGUMENT

## A. The District Court Prejudicially Erred in Admitting Evidence of Uncharged Acts and Criminal Street Gang Affiliation.

### *1. Standard of Review*

This Court reviews the district court's decision to admit evidence for abuse of discretion. *United States v. Holmes,* 129 F.4th 636, 655 (9th Cir. 2025).

### *2. Background*

a. The Uncharged Shooting

Over objection, the district court admitted evidence that Mr. Cho committed an uncharged shooting. The court admitted enhanced security camera footage of the shooting, as well a videotaped encounter that the police subsequently had with the shooting victim, a female vehicle passenger who had been struck in the neck. The latter recording showed the victim and driver with the police, with the victim moaning and crying in pain and fear. The district court abused its discretion, and admission of the evidence was not harmless.

Prior to trial, the government moved to admit the above-referenced evidence both as inextricably intertwined with the charges and pursuant to Fed. R. Evid. 404(b). The court rejected the government's argument that the shooting was inextricably intertwined with the charges, but admitted it under Fed. R. Evid. 404(b). 1-ER-135. The court commented that the uncharged shooting was admissible to show modus operandi, motive, opportunity, intent, knowledge, plan, identity and lack of accident and mistake. 1-ER-136. The district court ruled that the uncharged shooting was sufficiently similar to the charged acts to be admitted. 1-ER-138. The court also erroneously concluded that the 404(b) evidence was not more inflammatory than the anticipated trial evidence about the charged offenses. In fact, the uncharged shooting principally acted as evidence of propensity. The shooting was different from the charged conduct, did not meaningfully offer proof of Cho's identity, and finally, was substantially more prejudicial than probative.

At trial, the government presented the following evidence:

Ivan Kwag ran a karaoke studio and bar, called On and Off. 3-ER-591. On July 15, 2022, he was working, but was out in the parking lot.

3-ER-596. Cho appeared from behind, and asked who was in the car parked in front of the premises. 3-ER-596-97. Kwag was already walking over to the car; he intended to ask the person to identify himself. 3-ER-599. Kwag wanted to approach the man before Cho did, because he felt something dangerous might happen. *Id.*

Kwag said he went up to the car, and then told his manager to get the driver and the girl out quickly. 3-ER-601. The girls got back into the car and left. *Id.* Kwag said he saw Cho walking. *Id.* A few moments later, he heard a gunshot. 3-ER-602.

The incident was recorded on the bar's security camera. Exh. 19 and 20, played in evidence, were security camera recordings showing the interaction between Kwag, Cho and the van's occupant. Exh. 19 showed the van arriving, and two scantily clad girls getting out and going inside the bar. The prior video showed Cho wearing black, and depicted him opening the door of the minivan and speaking to the driver. Exh. 19.

The second video, Exhibit 20, occurred 80 seconds after the first. Exhibit 20 showed the van driving away, and a few moments later, Kwag and his friend startling. Exh. 23 was an enhanced version of

exhibit 20, showing a muzzle flash and a figure on the other side of some bushes located between the parking lot and the street. The security camera view was obscured by the bushes.

After the incident, Cho contacted Kwag to ask what had happened and if anyone had been hurt. 3-ER-603. Cho also asked him about the security camera footage, and Kwag falsely told him that the cameras did not record. 3-ER-604.

The government also introduced two other videos and the testimony of LAPD officer Steven Cavazos. Cavazos responded to an incident at approximately 1:57 am on July 15, 2022. He went to an underground parking structure, where he observed a van with three occupants. One female occupant had been struck by gunfire. 3-ER-64065. As previously mentioned, the videos showed the victim crying and moaning in pain.

### b. The Gang Evidence

The district court also admitted evidence that Mr. Cho was affiliated with the Grape Street Crips, a large, mostly African-American street gang, based in Compton, California.[5] The government had

[5] The defense moved in limine to exclude evidence of gang affiliation.

contended that the evidence was relevant to the victims' fear and explained why they paid Mr. Cho. 1-ER-112. The government also contended that Mr. Cho intimidated victims by claiming to be affiliated with the Grape Street gang. 1-ER-113. The court admitted the evidence ruling that "it tended to prove a material element of the extortion charge." 1-ER-118. After the government's victim witnesses testified, the defense renewed its motion to exclude the expert testimony as irrelevant, which the court denied. 3-ER-580-85.

The district court abused its discretion in admitting the gang evidence, particularly the expert testimony.

The evidence of gang affiliation consisted of numerous photographs showing Mr. Cho in the company of African-Americans, many of whom were wearing purple and throwing gang signs. 4-ER-870-76. The court also admitted photographs of Mr. Cho's tattoos, which supported an association with Grape Street. Over repeated objection, the court allowed a Los Angeles Police Department detective to testify at length about the Grape Street gang, its illegal activities, explain Mr. Cho's tattoos, and opine that a person would not be permitted to wear

the clothing and tattoos that he had without being a member. 3-ER-619-635.

LAPD Detective Rice testified that Grape Street made money through robberies, drugs, extortion, burglaries, and tax fraud. 3-ER-619-20. Rice claimed that extortion was rarely reported. 3-ER-622-23.

Rice testified that he had never seen a non-Grape Street member wearing colors or using Grape Street symbols in gang territory. 3-ER-624-25. He discussed the photographs and identified various hand signals shown therein as used by Grape Street. 3-ER-629-31. He also said he had arrested many of the persons appearing in the group photographs. 3-ER-631. Rice also identified many of Mr. Cho's tattoos as demonstrating Grape Street affiliation. 3-ER-634-36. Rice ended his direct examination by testifying that although Grape Street was overwhelmingly African-American, he had encountered non-African-American members. 3-ER-635-36. He admitted he had never met Mr. Cho. 3-ER-637.

### *3. The District Court Abused Its Discretion In Admitting Evidence Of the Uncharged Shooting.*

Fed. R. Evid. 404(b) governs the admissibility of other acts evidence. To be admissible under Rule 404(b), the evidence must satisfy

a four-part test: (1) sufficient evidence must exist for the jury to find that the defendant committed the other acts; (2) the other acts must be relevant to a material issue in the case; (3) the other acts must not be too remote in time; and (4) if admitted to prove intent, the other acts must be similar to the charged offense. *United States v. Ayers,* 924 F.2d 1468 (9th Cir. 1991). Evidence of prior crimes is not admissible to "prove the character of a person or to show that he acted in conformity with such alleged character." *United States v. Alfonso,* 759 F.2d 728, 739 (9th Cir. 1985).

Evidence of prior acts or crimes similar or identical to the offenses with which the defendant is currently charged is highly prejudicial. *See id.,* at 739-40; *United States v. Garcia-Orozco,* 997 F.2d 1302, 1304 (9th Cir. 1993) (admission of evidence of prior arrest for transporting marijuana not harmless); *United States v. Yeagin,* 927 F.2d 798, 803 (5th Cir. 1991); *United States v. Hodges,* 770 F.2d 1475, 1480 (9th Cir. 1985) (evidence of subsequent wrongdoing not harmless). Accordingly, this Court views evidence of extrinsic acts with disfavor. *United States v. Bradley,* 5 F.3d 1317, 1320 (9th Cir. 1993). To qualify as relevant under Rule 404(b), the government must articulate with precision "the

evidential hypothesis by which a fact of consequence will be inferred from the other acts evidence." *United States v. Mayans,* 17 F.3d 1174, 1181 (9th Cir. 1994). Other acts are not admissible simply because they are useful to the government.

If the district court determines that the evidence is admissible pursuant to Rule 404(b), the court still must determine whether the prejudicial impact resulting from the evidence of other acts outweighs its probative value. *See Alfonso,* 759 F.2d at 739; *Hodges,* 770 F.2d at 1480. "Unfair prejudice" refers to an 'undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one' or 'evidence designed to elicit a response from the jurors that is not justified by the evidence.'" *United States v. Ellis,* 147 F.3d 1131, 1135 (9th Cir. 1998) (quoting 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence,* § 403.04[1][b] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 1997)). "The probative value of evidence against a defendant is low where the evidence does not go to an element of the charge." *United States v. Gonzalez-Flores,* 418 F.3d 1093, 1098 (9th Cir. 2005).

When "the evidence is of very slight (if any) probative value, it's an abuse of discretion to admit it if there's even a modest likelihood of unfair prejudice or a small risk of misleading the jury." *United States v. Hitt,* 981 F.2d 422, 424 (9th Cir. 1992); *Gonzalez-Flores,* 418 F.3d at 1098 (abuse of discretion to admit evidence that two young aliens defendant brought into United States suffered heat stroke); *United States v. Brooke,* 4 F.3d 1480, 1487 (9th Cir. 1993)(evidence that defendant feigned cancer was likely to have a "visceral impact that far exceeds [its] probative value" (quoting *Hitt*, 981 F.2d at 424)).

Here, the principal connection between Mr. Cho's alleged involvement in the shooting at the vehicle was that all of the alleged conduct involved violence or threats of violence. *Id.* at 1183. The court commented that Cho's shooting of a victim and assaulting another were sufficiently similar to the charged carjacking to justify their admission. 1-ER-135-36. This conclusion is flawed.

In fact, the assaults were dissimilar, one involving a firearm used against a moving vehicle, and the other, a direct close-in assault on a person. The assaults certainly are not similar enough to provide an inference about modus operandi, signature, or plan. More significant,

the uncharged shooting was substantially more dangerous than the conduct charged in the indictment. The shooting was the only act that involved not only a firearm, but the shooting of a passenger who was essentially an innocent bystander. The incident also involved using a firearm against a moving vehicle, with the attendant risks to any others present in the area.

The use of violence does not provide sufficient similarity for admission under Rule 404(b). *Mayans,* 17 F.3d at 1184 (that the current charges and the prior bad acts all involved drug deals did not meet the similarity requirement). The shooting at an automobile did not tend to prove a material point, other than that the defendant was violent and dangerous. That point is fundamentally one of character and is not a viable basis for admission under Rule 404(b). Moreover, the uncharged shooting did not provide non-propensity based proof that Cho committed the assault on Yun Shin. Again, the only common characteristic was violence. *See United States v. Luna,* 21 F.3d 874, 881-82 (9th Cir. 1994) (district court erred by admitting evidence of additional bank robberies for evidence of identity, where robberies were

generic takeover robberies); *see also United States v. Schram,* 746 Fed. Appx. 688 (9th Cir. 2018).

The uncharged shooting also should have been excluded under Fed. R. Evid. 403 because its prejudicial impact substantially outweighed its probative value. *United States v. Bradley,* 5 F.3d at 1320; *Gonzalez-Flores,* 418 F.3d at 1098; *United States v. Arambula-Ruiz,* 987 F.2d 599, 604-05 (9th Cir. 1993).

Importantly, and contrary to the district court's statement, the uncharged act was more dangerous – and abhorrent-- than the charged offenses. The most violent event charged in the indictment was the beating of Yun Shin, which was captured on video. Witnesses also testified there were "rumors" or stories that Cho had been arrested with a gun. *E.g.,* 2-ER-403. Yun Shin and Jung claimed to have seen Cho in possession of a gun. 3-ER-480-81, 517-18. But, other than the uncharged act evidence, there was no evidence that Cho shot at anyone. Rather, the evidence showed that Cho was verbally aggressive in chat messages, and also used his fists, throwing punches at several persons.

Shooting at an occupied vehicle and striking a young woman in the neck – a woman who was an innocent victim in his feud with the

driver – is substantially more offensive to the average juror than a beating or carrying a gun. Shooting at a moving vehicle poses the risk of death or serious bodily injury to anyone in the area, whether the driver, a passenger, someone in a nearby vehicle or merely on the street. The prejudicial impact of the evidence substantially outweighed any marginal probative value it carried. Accordingly, the district court abused its discretion under Fed. R. Evid. 404(b) and 403 in admitting this evidence.

#### *4. The District Court Abused its Discretion in Admitting Evidence about the Grape Street Crips and Mr. Cho's Alleged Affiliation.*

Evidence of gang affiliation is inherently prejudicial. *United States v. Abel*, 469 U.S. 45, 52-53 (1984); *United States v. Takahashi*, 205 F.3d 1161, 1164 (9th Cir. 2000). This Court has recognized that testimony regarding gang membership "creates a risk that the jury will equate gang membership with the charged crimes." *United States v. Hankey*, 203 F.3d 1160, 1170 (9th Cir. 2000) (internal quotations and citations omitted). There is a significant potential for undue prejudice that attends labeling the defendant as a "gang member." *See Abel*, 469 U.S. at 53 (describing the tenets of the Aryan Brotherhood as "odious");

*Hankey*, 203 F.3d at 1173 (evidence of gang membership "probably creates a risk that the jury will 'equate gang membership with the charged crimes,'" quoting *United States v. Robinson*, 978 F.2d 1554, 1570 (10th Cir.1992) (Seth, J., dissenting)).

Gang evidence is typically admitted in cases involving a gang-related conspiracy, particularly in racketeering cases where enterprise is an element of the offense. *E.g., United States v. Rodriguez,* 766 F.3d 970, 986-87 (9th Cir. 2014) (admitting evidence about the Mexican Mafia in prison murder case where gang membership provided the motive for the crime); *United States v. Rios,* 830 F.3d 403, 414-16 (6th Cir. 2016)(evidence about the Latin Kings in a RICO prosecution for crimes committed by members of that organization). This Court also has approved of using gang evidence in the government's case in chief to rebut an anticipated entrapment defense. *United States v. Gomez,* 6 F.4th 992, 1004 (9th Cir. 2021). Of course, once a defendant raises an entrapment defense, his character becomes relevant, unlike in a case where a defendant merely attempts to raise a reasonable doubt. *Id.* The testimony of a gang expert also is admissible on the question of bias. *Hankey,* 203 F.3d at 1166. To be admitted, there must be a showing

that the defendant is a member of a gang and that his or her status may be an influence on the testimony of a witness, or that the evidence has some independent relevance to a material issue in the case. *Abel*, 469 U.S. at 52-53; *Takahashi*, 205 F.3d at 1164; *accord United States v. Easter*, 66 F.3d 1018, 1020-21 (9th Cir. 1995).

Gang evidence should be excluded, however, when it is principally probative of negative character or when it is introduced in an effort to prove intent or culpability. *See Mitchell v. Prunty*, 107 F.3d 1337, 1342-43 (9th Cir. 1997)(reversing the conviction and holding that evidence of membership in a gang cannot serve as proof of intent, because, while someone may be an "evil person," that is not enough to make him guilty under California law), *overruled on other grounds by Santamaria v. Horsley*, 133 F.3d 1242, 1248 (9th Cir. 1998); *see also United States v. Garcia*, 151 F.3d 1243, 1244-46 (9th Cir. 1998) (reversing conviction and stating that it would be contrary to the fundamental principles of our justice system to find a defendant guilty on the basis of his association with gang members). When gang evidence is proffered to prove a substantive element of the crime (and not for impeachment purposes), it is likely to be unduly prejudicial. *Mitchell v. Prunty,* 107 F.3d at 1342-

43. The use of gang membership evidence to imply "guilt by association" is impermissible and prejudicial. *Garcia*, 151 F.3d at 1246; *see Kennedy v. Lockyer*, 379 F.3d 1041, 1055-56 (9th Cir. 2004).

Here, the district court abused its discretion in admitting the testimony of the gang expert and the various photographs depicting Mr. Cho with purported gang members. The indictment did not charge Cho with a conspiracy. There were no allegations that members of the Grape Street Crips – or any other gang – acted together to extort doumi drivers, karaoke club owners, managers, or anyone else in the industry. But the expert nonetheless testified about Grape Street, including that its members engaged in robberies and extortion, as well as drug trafficking. That latter testimony provided an impermissible associational connection: that because Mr. Cho was affiliated with Grape Street, and because Grape Street members engaged in extortion, so too Mr. Cho engaged in extortion.

The relevance of the expert testimony to the trial evidence was minimal. Witnesses testified that they feared Mr. Cho and believed he was a gang member, but only one mentioned Grape Street. Lee testified that while Cho claimed to be a gangster, he did not tell him to which

gang he belonged. 2-ER-327. Only after Lee left the industry did he look at Cho's social media and see photos which made him "even more afraid." 2-ER-342. Thus, he had no knowledge of Cho's alleged Grape Street affiliation when he was being extorted. Shin similarly testified that Cho claimed he was in a gang. 2-ER-402-03. Only Jung said Cho was reputed to be a Grape Street member. 3-ER-516.

The witness testimony was admissible and is not challenged here. But, the photographs, which had not been seen by the government's witnesses during the extortion and LAPD officer Rice's testimony about the Grape Street Crips and its sets, Peda Roll Mafia and Baby Loc, should have been excluded. It was only after Shin's beating that Lee found gang-related pictures on Cho's social media account. By then, he had stopped paying. The government offered no evidence that doumi drivers viewed Cho's social media. The only evidence about communications between Cho and the alleged victims was that they communicated by phone and message, using an application similar to WhatsApp. Cho's messages did not claim any gang affiliation.

Thus, the photographs and expert testimony were not needed to understand the crime. *E.g.,* 2-ER-329-31. Nor was the expert testimony

regarding gang evidence necessary to evaluate the credibility of a witness or witnesses. *Cf. Abel,* 469 U.S. at 49 (fellow gang member testified on defendant's behalf). The only witness Mr. Cho called to testify was a member of the Los Angeles Police Department.

Moreover, there was an absence of evidence that the gang was somehow involved in the crimes. No evidence showed that he threatened persons with retaliation from other gang members. There was evidence he personally threatened people, but not with the threat of others. No evidence showed that he appeared with others, who assisted in the extortion. There was no evidence that he shared proceeds with other gang members or that the crime was undertaken by the gang as a whole. And, nothing suggested his gang membership was a motive for the charged conduct. *Cf. United States v. Rodriguez,* 766 F.3d at 986-87.

While the witness testimony that they believed Cho was a gang member was admissible, because it explained their state of mind, and provided a basis for their fear, the testimony from the gang expert and the photographs were not. The district court abused its discretion in admitting the unfairly prejudicial gang evidence.

*5. The Court's Errors Prejudiced the Defense.*

Admitting evidence that Cho fired shots at an occupied vehicle with the attendant risk to innocent bystanders damaged the defense and was unfairly prejudicial. The prejudice was multiplied by the video showing the gunshot victim – one of the hapless doumi girls – bleeding and moaning in the vehicle before an ambulance arrived. The shooting and the harm to the victim was not probative of anything other than the forbidden point: that Cho was a dangerous, violent man, one who did not care who he harmed.

Likewise, the gang evidence substantially harmed the defense. The expert testimony, in particular, was irrelevant to the charges, but served to paint a prejudicial picture of Mr. Cho as belonging to a large and dangerous street gang that routinely engaged in acts of violence, including extortion and robbery, supporting an improper inference that he himself engaged in extortion. The expert testimony also served as improper corroboration: corroborating the victims' testimony about their fear, their own state of mind, based on information of which they were unaware. The photographs of Cho with apparent gang members were

necessarily prejudicial, playing on stereotypes of dangerous Black gangs.

The errors also were prejudicial because of the quality of the government's evidence. Many of the government's victim witnesses benefited from their cooperation with the government: they all were undocumented aliens present in the country illegally and the government provided them with U Visas. 2-ER-322, 440-41, 459, 572-73. Despite their immigration status, they resisted admitting that they benefited from their cooperation. The victim of the assault, Yun Shin, testified inconsistently: first asserting that he had been attacked by two Black males, and then claiming that one attacker was Black and the other Asian. Shin also improbably testified that he could identify Cho by his eyes.

Given the impeachment of government's witnesses, it is reasonably probable that the admission of the uncharged shooting and the gang evidence affected the verdict. Reversal of the judgment is required.

## B. The District Court Erred in Disallowing Significant Cross-Examination.

### *1. Standard of Review*

This Court reviews de novo the district court's construction of the hearsay rules. *United States v. Marguet-Pillado*, 560 F.3d 1078, 1081 (9th Cir. 2009).

### *2. The Court Erroneously Sustained Multiple Hearsay Objections To Statements That Were Admissible, Because They Were Not Offered For Their Truth.*

Prior to trial, the government sought attempted to exclude all of the evidence about the nature of the doumi business, even attempting to exclude the term "doumi." 1-ER-141, 149-50. The government framed its request as attempting to preclude "victim-blaming." For its part, the defense stated that it was not seeking to show that the drivers were involved in sex trafficking, but wanted to introduce basic evidence about the industry so that the jurors would get an accurate picture of the events. 1-ER-157-59. The court agreed that some background would be allowed. 1-ER-159.

During the cross-examination of government witness Jun Lee, the court sustained hearsay objections to questions whether Lee received texts that certain clubs were going to be raided by the police. 2-ER-366.

The court sustained hearsay objections to questions whether he received messages about certain doumis who shouldn't be taken to certain clubs or employed. *Id.* The court also sustained a hearsay objection to whether Mr. Cho sent text messages as part of a group chat to warn about particular doumis who are bringing drugs to clubs. 2-ER-367.

The defense was trying to show that Mr. Cho, rather than extorting the victims, was attempting to organize the business and charged for his services. *E.g.,* 2-ER-366-67**.** To that end, the defense attempted to show that Cho provided information to drivers regarding club raids and troublesome employees through the chat application.

The district court erred in sustaining the government's hearsay objections to the above discussed evidence. The questioning was not designed to show that the truth of the matter – for example that a club was going to be raided -- but only went to the question whether or not the victim received information. It is apparent that the testimony sought to be elicited was not offered for the truth of the matter, the content of the alleged statements. Rather, the defense was attempting to elicit information from the witnesses regarding a group chat which

pertained to the business of driving girls around to clubs. These statements were not hearsay, they were offered for the fact that they were made, not for their truth. Fed. R. Evid. 801(c)(2); *Anderson v. United States,* 417 U.S. 211, 219-20 (1974); *United States v. Lopez-Alvarez*, 970 F.2d 583, 587 (9th Cir. 1992).

The error was not harmless. Although other witnesses admitted participating in the chat, and sharing information, 3-ER-486-87, 490, Lee and Shin were the government's star witnesses. Lee denied participating in the chat, attempting to shade his testimony in favor of the government. Lee and Shin were the most significant witnesses, as well as the only witnesses to the carjacking, the crime that carried the most serious penalties.

The court's erroneous decision to sustain the prosecution's objections hampered the defense's ability to make its case: that Cho provided a service to the drivers and was not merely extorting money from them. The defense should have been permitted to freely cross-examine Lee and Shin, two witnesses who both benefited substantially from their cooperation with the government. Because the preclusion of

this cross-examination was not harmless, this Court should reverse the judgment of conviction.

### C. The District Court Procedurally Erred by Imposing a Two-Level Upward Adjustment for Vulnerable Victim.

The probation officer recommended and the district court found that the victims of the extortion offense were unusually vulnerable. 1-ER-16-21, 64-66. The court, therefore, applied a two-level upward adjustment to each count pursuant to U.S.S.G. §3A1.1(b)(1). The district court erred.

U.S.S.G. §3A1.1(b)(1) provides for a two-level enhancement if the defendant knew or reasonably should have known that a victim of the offense was a vulnerable victim. The commentary defines a vulnerable victim as one "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." *Id.*, §3A1.1, cmt 2. Victims who are vulnerable are "those who are in need of greater social protection." *United States v. Castellanos,* 81 F.3d 108, 111 (9th Cir. 1996). Vulnerability should be determined by considering the characteristics of the defendant's chosen victims, the victim's reaction to the criminal conduct, and the circumstances surrounding the criminal act. *United States v. Peters,*

962 F.2d 1410, 1417 (9th Cir. 1992); *see also United States v. Backman,* 817 F.3d 662, 670 (9th Cir. 2016)(victim was vulnerable where she was tricked into coming to Saipan on false pretenses, forced into prostitution, her passport was withheld, she had no family or friends in Saipan, spoke no English at all, and she was held under lock and key). General characteristics such as low income or lack of education do not support an upward adjustment for a vulnerable victim. *United States v. Castaneda*, 239 F.3d 980, 982-83 (9th Cir. 2001).

The court agreed with the probation officer and ruled that each victim was unusually vulnerable. The court stated:

> The crimes in this case took place over an approximately five-year period between 2018 and March 16 of 2023. Mr. Cho extorted individuals that he curated, anywhere from 20 to 30 according to his Venmo records and the victims' statements. They were largely sole proprietors of businesses in Koreatown, part of a small, insular world of Korean karaoke bars, drivers, and hostesses. And all of the victims were either managers and drivers of hostesses catering to karaoke bars or managers of karaoke bars.
>
> All of the victims were Korean immigrants. Their command of English was weak. They lacked legal status in the United States, and they were unschooled in the American legal system. They were not the sorts of people in our country who would avail themselves of the protections that the law affords them. Go to court,

> secure protective orders, or call the police and demand protection and prosecution.
>
> Like so many first-generation immigrants, their primary focus was survival in a new land which in part required not drawing attention to themselves. Mr. Cho knew exactly who his victims were, their vulnerabilities, and that their condition made them particularly susceptible to extortion.
>
> The defendant shared a common culture and language with them. The victims were entirely dependent on their small businesses, their automobiles, their hostesses, and their bar patrons to survive. The defendant knew this, and he knew that they would pay to keep working and keep their businesses alive so long as he inflicted just enough fear and intimidation and showed that he was capable of committing acts of violence.

1-ER-65-66.

The vulnerable victim enhancement is designed to impose additional punishment on an offender who victimizes persons who are more vulnerable than is usual for the type of victim in the charged offense. Generally, however, class-based characteristics are insufficient to establish that a particular victim is vulnerable. The exception, of course, is set forth in the guidelines: persons who are unusually vulnerable due to age or physical or mental condition. A class of victims is not particularly susceptible merely because they are statistically

more likely to fall prey to the defendant's crime. *See United States v. Box*, 50 F.3d 345, 358-59 (5th Cir. 1995) (rejecting vulnerable victim enhancement for law enforcement defendants who extorted money from travelers arrested at a roadside park in exchange for promises that the charges, usually public lewdness or indecent exposure, would be dropped or reduced). Thus, groups such as small business owners or immigrants are not unusually vulnerable. *See Castellanos,* 81 F.3d at 1131 (holding that Spanish speakers were not unusually vulnerable); *see also Castaneda,* 239 F.3d at 982-84 (vulnerable victim enhancement vacated when victims of prostitution scheme were not more vulnerable than the usual victim of sex trafficking).

This Court has previously rejected the notion that victims are unusually vulnerable based on their lack of English fluency or their immigrant status. *United States v. Castellanos*, 81 F.3d 108, 110-11 (9th Cir. 1996). *Castellanos* explained:

> It is possible that Spanish-speaking individuals may be more likely to become victims of a fraud perpetuated by a Spanish-speaking defendant than would English-speaking persons. It is also possible that because of some cultural affinity Hispanics are more likely to become victims to a fraud perpetrated by an Hispanic defendant making an appeal to ethnic pride. It is unnecessary to address the validity of either of those

> premises, however, because it is not enough to support a finding of particular susceptibility under § 3A1.1 that the victims are more likely than other members of the general population to become a victim to the particular crime at issue. The reason for this is that *criminals will always tend to target their victims with an eye toward success in the criminal endeavor. Thus, the chosen victims are usually more susceptible than the general population to the criminal conduct.*

81 F.3d at 110 (emphasis added).

Accordingly, the fact that defendants target a certain group does not merit a sentence enhancement under § 3A1.1. "Otherwise, all but the most unthinking of criminal defendants would be candidates for upward adjustments under § 3A1.1. Instead, the victims to whom § 3A1.1 applies are those who are in need of greater societal protection." *Castellanos,* 81 F.3d at 111. Alternatively, a characteristic of the defendant's chosen victims must render the defendant's conduct more criminally depraved. *United States v. Luca,* 183 F.3d 1018, 1026-27 (9th Cir. 1999); *see United States v. Mendoza,* 262 F.3d 957, 958 (9th Cir. 2001) (vulnerable victim enhancement upheld where defendant posed as an immigration officer and sold false employment documents to undocumented aliens, who had been fired from their jobs following an INS workplace raid, and who had fled into a street and even onto a

freeway to avoid the raid). Courts may not conclude victims are vulnerable or unusually susceptible based on shared language or cultural heritage. *Luca,* 183 F.3d at 1028.

Here, the court broadly concluded that the victims were vulnerable because they were (a) were part of an insular community, (b) undocumented, (c) did not speak English fluently, and (d) were unschooled in the American legal system. All of these characteristics are common to immigrants. The court disregarded that the victims in this case had been in this country for many years, and had managed to work successfully throughout despite their lack of legal status. There was no showing that they were somehow more insular than other immigrants, or even other Korean immigrants. Moreover, the drivers chose to work in an industry that falls close to sex trafficking. The drivers, like sex traffickers, earned money for transporting women who were engaged in an industry that, at a minimum, objectified them. The karaoke club managers also profited from the women. Cho did not, however, target the women. But, there was no showing that the drivers and club managers were somehow compelled to engage in this line of work because of some vulnerability.

More importantly, there was no showing that the victims were unusually vulnerable compared to usual extortion victims. Small businessman and sole proprietors have been historically subjected to extortion. *E.g., United States v. Hill,* 645 F.3d 900 (7th Cir. 2011); *United States v. Shyllon,* 10 F.3d 1 (D.C. Cir. 1993). That fact does not make them unusually vulnerable. Likewise, insularity or lack of English fluency do not render victims vulnerable. Nor, without more does undocumented immigration status. There was no evidence that the witnesses' undocumented status was known to immigration authorities. *Cf. United States v. Solorza,* 470 Fed. Appx. 669 (9th Cir. 2012) (undocumented immigrants whose status was known to ICE were vulnerable victims). And, mothing suggests, unlike the vulnerable victim in *United States v. Veerapol,* 312 F.3d 1128, 1130, 1132-33 (9th Cir. 2002), that the victims were isolated from their community, or unable to approach police. *Cf. id.* (unsophisticated, non-English speaking victim of labor trafficking was vulnerable where the defendant isolated her from her community, confiscated her passport, and threatened to have her arrested as an illegal alien were she to seek help from police). It is equally likely that the club managers did not seek law

enforcement assistance because they were selling alcohol after hours as because they were afraid. Similarly, the drivers were engaged in conduct that, if not sex trafficking, bordered on it. While offenders can be victims, the drivers and bar managers were not unusually vulnerable.

This Court should reverse Mr. Cho's sentence and remand for resentencing without the two-level upward adjustment for vulnerable victim.

## VII. CONCLUSION

Based on the foregoing arguments, this Court should vacate the judgment of conviction. In the alternative, this Court should vacate the sentence and remand for resentencing without the two-level upward adjustment for vulnerable victim.

Dated: May 30, 2025

Respectfully submitted,

/s/Karen L. Landau

KAREN L. LANDAU
Attorney for Appellant
Daekun Cho

## STATEMENT OF RELATED CASES

Appellant is unaware of any related cases.

# CERTIFICATE OF COMPLIANCE

I certify that:

_x_ 1. Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Cir. R. 32-1, the attached opening brief is:

_x_ Proportionately spaced, has a typeface of 14 points or more and contains 8,486 words;

or is

__ Monospaced, has 10.5 or fewer characters per inch and contains _______words or ____ lines of text (opening briefs must not exceed 14,000 words or 1300 lines of text); or

___ 2. The attached brief is not subject to the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because:

__ This brief complies with Fed. R. App. P. 32(a)(1)-(7) and is a principal brief of no more than 30 pages or a reply brief of no more than 15 pages. Ninth Cir. R. 32-1.

_/s/ Karen L. Landau

Karen L. Landau