No. 24-5185

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

*v.*

DAEKUN CHO,
*Defendant-Appellant*.

*APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA DISTRICT COURT NO. CR 23-149-FLA*

**GOVERNMENT'S ANSWERING BRIEF**

BILAL A. ESSAYLI
Acting United States Attorney

JOSEPH T. MCNALLY
Assistant United States Attorney
Acting Chief, Criminal Division

JENA A. MACCABE
KEVIN J. BUTLER
Assistant United States Attorneys
Major Crimes Section

1300 United States Courthouse
312 North Spring Street
Los Angeles, CA 90012
Telephone: (213) 894-5046/6495
Email: jena.maccabe@usdoj.gov
kevin.butler2@usdoj.gov

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

# TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. ISSUES PRESENTED ........ 2

III. STATEMENT OF THE CASE ........ 4

A. Jurisdiction, Timeliness, and Bail Status ........ 4

B. Statement of Facts and Procedural History ........ 4

1. Trial evidence ........ 4

a. Defendant extorted two partners who ran a driving company and beat and carjacked one of them (Counts 1-4 and 57) ........ 4

b. For years, defendant extorted another driver, whom defendant physically assaulted and threatened to kill (Counts 5-32 and 56) ........ 8

c. Defendant extorted yet another driver (Counts 40-55) ........ 10

d. Defendant's extortion of karaoke bars (Counts 33-39) ........ 12

2. Defense theory ........ 14

3. Verdict ........ 15

4. Sentencing ........ 16

IV. SUMMARY OF ARGUMENT ........ 19

V. ARGUMENT ........ 22

## TABLE OF CONTENTS

A. The District Court Did Not Abuse Its Discretion in Admitting an Uncharged Shooting That Furthered Defendant's Extortion Scheme ..... 22

1. Standard of review ..... 22

2. Facts ..... 22

3. Legal background on extortion ..... 25

4. The district court did not abuse its discretion under Rule 404(b) because the uncharged shooting tended to prove a material point and was sufficiently similar to the charged conduct ..... 26

a. The evidence tended to prove defendant's intent and knowledge, which were the central disputes at trial ..... 27

b. The acts are similar ..... 34

5. The district court did not abuse its discretion under Rule 403 ..... 36

6. Alternatively, defendant's shooting was inextricably intertwined with the charges ..... 39

7. Any error was harmless ..... 42

B. The District Court Did Not Plainly Err or Abuse Its Discretion in Admitting Evidence of Defendant's Gang Affiliation ..... 48

1. Facts ..... 48

2. Standard of review ..... 50

3. The district court did not plainly err in admitting defendant's Instagram posts ..... 51

## TABLE OF CONTENTS


4. Admitting the gang expert's testimony was within the district court's discretion ..... 54

a. The gang expert testimony was highly probative ..... 54

b. The district court did not abuse its discretion under Rule 403 ..... 58

5. Any error was not prejudicial ..... 60

C. The District Court Did Not Plainly Err in Sustaining Objections to Lee's Cross-Examination ..... 61

1. Facts ..... 61

2. Standard of review ..... 63

3. Defendant's own statements were either hearsay or irrelevant ..... 63

4. Any error was not prejudicial ..... 66

D. The District Court Did Not Clearly Err in Applying a Two-Level Enhancement Based on Its Finding That Defendant's Victims Were Vulnerable ..... 68

1. Standard of review ..... 68

2. The vulnerable victim finding was logical, plausible, and supported by the record ..... 69

VI. CONCLUSION ..... 74

# TABLE OF AUTHORITIES

**DESCRIPTION** **PAGE(S)**

## Federal Cases

*Anderson v. United States*,
417 U.S. 211 (1974) .................................................. 64

*Carbo v. United States*,
314 F.2d 718 (9th Cir. 1963) .................................................. 30

*Delaware v. Van Arsdall*,
475 U.S. 673 (1986) .................................................. 42

*Gentry v. Sinclair*,
705 F.3d 884 (9th Cir. 2013) .................................................. 67, 68

*Johnson v. United States*,
318 U.S. 189 (1943) .................................................. 60, 61, 62

*Kennedy v. Lockyer*,
379 F.3d 1041 (9th Cir. 2004) .................................................. 57

*Mitchel v Prunty*,
107 F.3d 1337 (9th Cir. 1997) .................................................. 57

*Santamaria v. Horsley*,
133 F.3d 1242 (9th Cir. 1998) .................................................. 57

*United States v. Abel*,
469 U.S. 45 (1984) .................................................. 59

*United States v. Aliaga*,
617 F. App'x 971 (11th Cir. 2015) .................................................. 30

*United States v. Anchrum*,
590 F.3d 795 (9th Cir. 2009) .................................................. 57

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

*United States v. Andreis*,
802 F. App'x 272 (9th Cir. 2020) ........................................................ 34

*United States v. Bailleaux*,
685 F.2d 1105 (9th Cir. 1982) ........................................................ 58

*United States v. Bengali*,
11 F.3d 1207 (4th Cir. 1993) ........................................................ 17, 70

*United States v. Berckmann*,
971 F.3d 999 (9th Cir. 2020) ........................................................ 38

*United States v. Box*,
50 F.3d 345 (5th Cir. 1995) ........................................................ 72, 73

*United States v. Castellanos*,
81 F.3d 108 (9th Cir. 1996) ........................................................ 70

*United States v. Chang Ru Meng Backman*,
817 F.3d 662 (9th Cir. 2016) ........................................................ 72, 73

*United States v. Cox*,
963 F.3d 915 (9th Cir. 2020) ........................................................ 36, 37

*United States v. Curtin*,
489 F.3d 935 (9th Cir. 2007) ........................................................ 26, 27

*United States v. Daane*,
475 F.3d 1114 (9th Cir. 2007) ........................................................ 26

*United States v. Dischner*,
974 F.2d 1502 (9th Cir. 1992) ........................................................ 25, 26

*United States v. Dorsey*,
677 F.3d 944 (9th Cir. 2012) ........................................................ 39

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**


*United States v. Enmons*,
410 U.S. 396 (1973) .......... 26

*United States v. Espinoza-Baza*,
647 F.3d 1182 (9th Cir. 2011) .......... 36

*United States v. Fazio*,
770 F.3d 160 (2d Cir. 2014) .......... 51, 52

*United States v. Garcia*,
151 F.3d 1243 (9th Cir. 1998) .......... 57

*United States v. Gilley*,
836 F.2d 1206 (9th Cir. 1988) .......... 41

*United States v. Gomez*,
6 F.4th 992 (9th Cir. 2021) .......... 51, 54, 55

*United States v. Gonzales*,
506 F.3d 940 (9th Cir. 2007) (en banc) .......... 40

*United States v. Hankey*,
203 F.3d 1160 (9th Cir. 2000) .......... 38, 59

*United States v. Harris*,
916 F.3d 948 (11th Cir. 2019) .......... 51

*United States v. Hinkson*,
585 F.3d 1247 (9th Cir. 2009) .......... 22, 23, 69

*United States v. Jayavarman*,
871 F.3d 1050 (9th Cir. 2017) .......... 37

*United States v. Joetzki*,
952 F.2d 1090 (9th Cir. 1991) .......... 58

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

*United States v. Johnson*,
132 F.3d 1279 (9th Cir. 1997) .... 34

*United States v. Johnson*,
735 F.2d 1200 (9th Cir. 1984) .... 57

*United States v. Johnson*,
875 F.3d 1265 (9th Cir. 2017) .... 50

*United States v. Kelly*,
874 F.3d 1037 (9th Cir. 2017) .... 65

*United States v. Koziol*,
993 F.3d 1160 (9th Cir. 2021) .... 25, 26

*United States v. Lague*,
971 F.3d 1032 (9th Cir. 2020) .... 22, 27

*United States v. Larson*,
495 F.3d 1094 (9th Cir. 2007) .... 66

*United States v. Lloyd*,
807 F.3d 1128 (9th Cir. 2015) .... 68

*United States v. Lopez-Alvarez*,
970 F.2d 583 (9th Cir. 1992) .... 65

*United States v. Marsh*,
26 F.3d 1496 (9th Cir. 1994) .... 25, 31

*United States v. Matsumaru*,
244 F.3d 1092 (9th Cir. 2001) .... 71, 73

*United States v. Melicharek*,
360 F. App'x 223 (2d Cir. 2010) .... 40

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

*United States v. Mende*,
43 F.3d 1298 (9th Cir. 1995) .......... 59

*United States v. Mendoza*,
262 F.3d 957 (9th Cir. 2001) .......... 71, 73

*United States v. Mixon*,
930 F.3d 1107 (9th Cir. 2019) .......... 41

*United States v. Montoya*,
945 F.2d 1068 (9th Cir. 1991) .......... 31

*United States v. Morales*,
108 F.3d 1031 (9th Cir. 1997) .......... 25

*United States v. Olano*,
507 U.S. 725 (1993) .......... 51, 54, 66

*United States v. Olivas*,
150 F.4th 1107 (9th Cir. 2025) .......... 50, 63

*United States v. Ortega*,
203 F.3d 675 (9th Cir. 2000) .......... 64, 66

*United States v. Perez-Silvan*,
861 F.3d 935 (9th Cir. 2017) .......... 65

*United States v. Perrotta*,
289 F.3d 155 (1st Cir. 2002) .......... 52

*United States v. Peters*,
962 F.2d 1410 (9th Cir. 1992) .......... 74

*United States v. Plascencia-Orozco*,
852 F.3d 910 (9th Cir. 2017) .......... 36

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

*United States v. Quinn*,
18 F.3d 1461 (9th Cir. 1994) .......... 33

*United States v. Ramirez-Jiminez*,
967 F.2d 1321 (9th Cir. 1992) .......... 41

*United States v. Rodriguez*,
766 F.3d 970 (9th Cir. 2014) .......... 57

*United States v. Sanchez-Lopez*,
879 F.2d 541 (9th Cir. 1989) .......... 65

*United States v. Schweihs*,
971 F.2d 1302 (7th Cir. 1992) .......... 29, 30

*United States v. Shyllon*,
10 F.3d 1 (D.C. Cir. 1993) .......... 17, 69

*United States v. Solorza*,
470 F. App'x 669 (9th Cir. 2012) .......... 71

*United States v. Tai*,
994 F.2d 1204 (7th Cir. 1993) .......... 34

*United States v. Takahashi*,
205 F.3d 1161 (9th Cir. 2000) .......... 59

*United States v. Tkhilaishvili*,
926 F.3d 1 (1st Cir. 2019) .......... 30, 33

*United States v. Torres*,
794 F.3d 1053 (9th Cir. 2015) .......... 60

*United States v. Tsarnaev*,
595 U.S. 302 (2022) .......... 22

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

*United States v. Valencia-Amezcua*,
278 F.3d 901 (9th Cir. 2002) .... 56

*United States v. Van Metre*,
150 F.3d 339 (4th Cir. 1998) .... 35

*United States v. Veerapol*,
312 F.3d 1128 (9th Cir. 2002) .... 72, 74

*United States v. Verduzco*,
373 F.3d 1022 (9th Cir. 2004) .... 27

*United States v. Villalobos*,
748 F.3d 953 (9th Cir. 2014) .... 26

*United States v. Vo*,
413 F.3d 1010 (9th Cir. 2005) .... 27

*United States v. Williams*,
291 F.3d 1180 (9th Cir. 2002) .... 40

*United States v. Winters*,
729 F.2d 602 (9th Cir. 1984) .... 35

*United States v. Yazzie*,
59 F.3d 807 (9th Cir. 1995) .... 58

*United States v. Young*,
470 U.S. 1 (1985) .... 60

**Federal Statutes**

18 U.S.C. § 1951(b)(2) .... 25

18 U.S.C. § 3231 .... 4

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

18 U.S.C. § 3742(a) .................... 4

28 U.S.C. § 1291 .................... 4

**Fedeal Rules**

Fed. R. App. P. 4(b)(1)(A)(i) .................... 4

Fed. R. Evid. 403 .................... 22, 58

Fed. R. Evid. 404(b) .................... passim

Fed. R. Evid. 801(d)(2) .................... 64

**United States Sentencing Guidelines**

U.S.S.G. § 3A1.1(b) .................... 16, 69

U.S.S.G. § 3A1.1 .................... 72

No. 24-5185

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

*v.*

DAEKUN CHO,
*Defendant-Appellant*.

*APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
DISTRICT COURT NO. CR 23-149-FLA*

**GOVERNMENT'S ANSWERING BRIEF**

# I

# INTRODUCTION

For years, defendant Daekun Cho, also known as "DK," terrorized karaoke businesses operating in Los Angeles's Koreatown. He extorted monthly "dues" and so-called protection fees from bar owners and drivers who made a living transporting hostess/companions (called "doumis") to work at the bars, and threatened and assaulted those who resisted paying—from "hunting," as defendant called it, to assaults,

carjacking, and shooting. Defendant also would restrict doumi drivers from going to certain karaoke bars if the driver or bar owner refused to pay the monthly fee. Such restrictions began with demands via text and ended in financial or physical penalties for disobedience. The victims he threatened and harmed got in line. The rest of the community learned never to step out of line.

For his crimes victimizing five individuals (doumi drivers and a karaoke bar manager), a jury convicted defendant of extortion, attempted extortion, and carjacking causing serious bodily injury. His convictions and 270-month sentence should be affirmed.

## II

## ISSUES PRESENTED

A. Whether the district court abused its discretion in admitting evidence of an uncharged shooting defendant committed that furthered his extortion scheme, where (1) the uncharged shooting tended to prove defendant's knowledge and intent to extort; (2) the evidence was more probative than prejudicial because defendant's knowledge and intent were the primary disputed issues at trial; (3) alternatively, defendant's shooting was inextricably intertwined with the charged offenses; and (4)

any error was harmless because there was overwhelming evidence at trial that defendant obtained money from his victims through violence and threats of violence rather than because he was providing them with any legitimate service.

B. Whether the district court plainly erred in admitting defendant's social media posts broadcasting his gang affiliation to his victims or abused its discretion under Rule 403 in admitting expert testimony about that gang affiliation, where such evidence was relevant to provide context and prove defendant's attempts to instill fear in the victims.

C. Whether the district court plainly erred in sustaining objections to cross-examination of a victim seeking to elicit evidence that was either hearsay or not relevant.

D. Whether the district court clearly erred in finding that defendant's victims were vulnerable under the sentencing guidelines.

# III

# STATEMENT OF THE CASE

## A. Jurisdiction, Timeliness, and Bail Status

The district court's jurisdiction rested on 18 U.S.C. § 3231. This Court's jurisdiction rests on 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291. The district court entered judgment on August 20, 2024. (CR-133.)[1] Defendant filed a timely notice of appeal on August 21, 2024. (4-ER-899.) *See* Fed. R. App. P. 4(b)(1)(A)(i). Defendant is in custody.

## B. Statement of Facts and Procedural History

### *1. Trial evidence*

#### *a. Defendant extorted two partners who ran a driving company and beat and carjacked one of them (Counts 1-4 and 57)*

Yun Soo Shin ("Yun Shin") and his business partner Joo Hun Lee ("Lee") operated a company called "Plus" that drove doumis to work at karaoke bars. (2-ER-323, 397-98.) Doumi drivers at various companies were paid in a similar fashion—after a doumi finished work, she would

---

[1] "CR" refers to the Clerk's Record in the district court and is followed by the docket number. "AOB" refers to Appellant's Opening Brief, and "PSR" refers to the Presentence Report.

pay the driver a flat hourly rate regardless of how much the doumi had earned. (2-ER-323, 361-63, 398, 446-47.)

In July 2019, defendant approached Yun Shin in the parking lot of a karaoke bar. (2-ER-400.) Defendant told Yun Shin that if he and Lee wanted to continue to do business, they must start paying defendant so-called protection fees. (2-ER-384, 400.) Yun Shin testified that defendant claimed that the payments were for "protection" but that he did not do anything for Yun Shin or his company and that Yun Shin and Lee were paying him "[b]ecause [they] were scared of him." (2-ER-402.) Yun Shin and Lee paid defendant for a year and a half, first in cash and later using Venmo. (2-ER-400-03.)

In 2021, Yun Shin and Lee stopped paying defendant when he demanded higher monthly payments. (2-ER-331, 403.) On April 21, 2021, as captured on Yun Shin's dash camera, defendant told Yun Shin, "I need my money," and asked if Yun Shin "called the cops." (2-ER-408-09; *see also* 2-ER-452-53, 457 (date).) Yun Shin believed that defendant "was trying to threaten [him] to pay up. And he was . . . trying to start all this fight." (2-ER-410.) Lee testified that defendant told Yun Shin

to be careful, which Lee understood to mean that they would not be able to work and "might get physically harmed." (2-ER-383-84.)

On May 8, 2021, in response to Yun Shin's lack of payment, defendant and his accomplice pulled Yun Shin out of his rental car and beat him with metal baseball bats. (2-ER-410-11, 414; *see also* 2-ER-439 (date).) As shown on CCTV footage, they were lying in wait in the parking lot when Yun Shin pulled up in a rented minivan. (Trial Ex. 10 (video with defendant and his accomplice circled in the upper righthand corner).)[2] Defendant and his accomplice immediately exited their car. (*Id.*)

While they were attacking Yun Shin, defendant screamed at his accomplice to "[f]uck him up. Fuck him up." (2-ER-416.) During the attack, Yun Shin yelled to defendant, "I will pay you. I will pay you. I will pay you." (2-ER-334-35.) Even after defendant's accomplice walked away from the beating, defendant continued hitting Yun Shin with his metal baseball bat, attempting to hit him in the head, but Yun Shin blocked his face and head with his forearm. (Trial Ex. 11; 2-ER-419.)

[2] The government has moved to transmit Trial Exhibits 10, 11, 17, 19, and 20, which are video or audio recordings.

After attacking Yun Shin, defendant stole Yun Shin's car, phone, and bags, as well as everything else in his car. (2-ER-430.)

During the carjacking, defendant and his accomplice broke Yun Shin's arm, cut open his leg, and injured other parts of his body, "including his neck, bilateral lower extremities, [and] his right arm." (2-ER-393, 418.) While hospitalized, Yun Shin received "the strongest pain medication" in "the highest dose" available. (2-ER-395.)

Defendant wore a mask with a skeleton graphic during the attack, but Yun Shin was able to identify defendant by his eyes, which remained visible, and his voice. (2-ER-416-17.) Shortly after the attack, defendant posted a photograph of himself on Instagram wearing the same skeleton mask, which Lee captured and showed to Yun Shin, who identified defendant as his attacker. (2-ER-338-39, 434; SER-18.)

After defendant's attack, Yun Shin and Lee closed their business out of fear of defendant, and Lee fled to another state with his family. (2-ER-341.)

#### b. *For years, defendant extorted another driver, whom defendant physically assaulted and threatened to kill (Counts 5-32 and 56)*

Sang Heun Shin ("Sang Shin"), another karaoke driver, also paid defendant a monthly extortion fee, first in cash and later through Venmo. (3-ER-540, 542-43.) When Sang Shin started his own driving company, he paid defendant purportedly for protection from gangs and danger. (3-ER-542.) Although defendant did not provide any protection, Sang Shin was afraid that if he did not pay defendant, defendant would ban him from going to karaoke bars and earning income. (*Id.*) Sometimes, defendant banned karaoke bars from having drivers drop off doumis because the karaoke bars were not paying defendant. (*See* 3-ER-547.) When Sang Shin drove to banned karaoke bars, defendant demanded a penalty from Sang Shin. (*Id.*) Eventually, Sang Shin stopped paying defendant because he thought he was not being protected. (3-ER-546.)

After Sang Shin stopped paying, defendant, saying that he felt "like hunting tonight," texted people asking where Sang Shin lived and drove and what vehicle he drove. (*See* 3-ER-676-77, 680.) Subsequently, defendant approached Sang Shin, who was sitting in his

car, and punched him in the face. (3-ER-548.) Defendant also threatened to "kill" Sang Shin. (3-ER-549.) After defendant threw Sang Shin's wallet on the ground, Sang Shin did not retrieve it immediately because he was worried defendant might have a weapon in his car since defendant was in a gang and Sang Shin had heard that defendant had fired a gun before.[3] (3-ER-549-50.)

That night, defendant bragged in a text, "I got [Sang Shin] Ha ha," and the next day texted, in "K-Town. I socked his ass." (3-ER-677.) Defendant texted another person, "I found him and socked him." (3-ER-679.) Sang Shin started paying defendant again out of fear. (3-ER-551.)

Sang Shin reported defendant's crimes to law enforcement and agreed to wear a recording device and allow officers to watch him pay defendant an extortion fee. (*Id.*) Defendant messaged Sang Shin to meet him in a parking garage for a karaoke bar. (3-ER-553.) Defendant then messaged Sang Shin asking if Sang Shin had called the

---

[3] *See* section V(A) *infra*.

police (*id.*) and later told Sang Shin, "I seen many undercovers" (SER-35).

Defendant changed the location for the meeting multiple times (3-ER-554), and expressed concern that undercover officers were following him (*e.g.*, Trial Ex. 17 (recording of defendant and Sang Shin's phone call).) Eventually, defendant instructed Sang Shin to give the money to an intermediary. (3-ER-558-59; SER-35.) The intermediary—Young Nae Kang ("Kang")—paid defendant via Venmo on Sang Shin's behalf. (3-ER-468-69; SER-38.)[4]

#### c. *Defendant extorted yet another driver (Counts 40-55)*

Kang, the karaoke driver who served as Sang Shin's intermediary, was also extorted by defendant. Kang testified that defendant sent threatening text messages, and he paid defendant so that he could work but defendant was not giving him anything in return for those payments. (2-ER-465; 3-ER-474-75.) Kang paid those extortion fees monthly via Venmo. (3-ER-467-68.) Defendant also demanded that

[4] Because government funds were used, this payment was charged as an attempted extortion. (*See* 3-ER-552.)

Kang pay $200 penalties for violating defendant's bans on certain karaoke bars. (3-ER-474-75.)

In one text conversation with Kang, defendant said: "Aye. Send 200. Penalty[.] If u violate our rule one more time[,] U gonna see the real demon." (SER-19.) In a group message thread with driving companies, defendant ordered the drivers not to go to certain karaoke bars and threatened them to make sure they did not. (3-ER-470 ("You violated, you gonna get it. Ask next driver what happens."); SER-22.) Kang understood defendant's threats to mean that if drivers did not comply with defendant's demands, defendant would beat them or otherwise physically harm them. (3-ER-470-71.)

During the time period defendant extorted Kang, Kang witnessed defendant attack a driver and waiter at "Soopsok" (or "Forest") karaoke. Kang was in the parking lot when defendant beat a karaoke waiter for calling a driving company that defendant ordered him not to call. (3-ER-480, 497.) Kang also saw defendant hit a driver during the incident. (3-ER-485.) The next morning, defendant admitted in a text, "I went to soopsok. Saw a Dior driver. Soopsok didn't even call them. I punched him twice hahaha." (SER-58.) "Dior" was not paying defendant. (*See*

SER-51-52 (defendant saying that the "[o]nly companies not in our association [are] star and boo [and] Dior").) In January 2023, defendant again admitted to the attack, bragging, "At forest I socked his bitchass." (SER-57.)

On another occasion, Kang saw defendant carrying an assault rifle at Soopsok and told Ki Young Jung ("Jung"), another of defendant's victims, about it. (3-ER-481.)

#### *d. Defendant's extortion of karaoke bars (Counts 33-39)*

Defendant's extortion went beyond drivers; he also extorted Jung, a karaoke bar manager, who said that he "did not pay [defendant] voluntarily." (3-ER-509, 514-15, 531, 535.) Jung started paying defendant "[b]ecause he threatened that if we don't pay, we'll lose business, and he will do something to us," meaning "[p]hysical harm." (3-ER-513.) Jung explained that defendant would cause them to lose business by coming to his karaoke bar to "use violence." (3-ER-536.)

Jung also described defendant's bans against drivers. Defendant "told [Jung] that [he] should not take" drivers that defendant had banned and would "threaten [Jung] to listen to him and comply with him." (3-ER-516.) If Jung allowed a banned driver to come to the bar,

defendant would "try to shut [Jung's] business down and then do a physical harm on [Jung's] staff." (*Id.*) However, Jung was clear that defendant did not provide services, such as sending drivers to the karaoke bar or preventing doumis from creating problems (like bringing drugs into the bar). (3-ER-524-25.)

Jung also testified that approximately five years earlier, he witnessed defendant show up to "Chatterbox" karaoke one night after closing, point a gun at the owner, and demand that the owner open the bar. (3-ER-517.) When Jung worked at a karaoke bar called "Eight," defendant told him that he was going to shoot someone who came inside, and Jung saw that defendant had a gun in his pocket. (3-ER-517-18.)

One night, defendant called Jung asking if a certain customer was inside his karaoke bar. (3-ER-518.) After Jung confirmed that the customer was inside, defendant told Jung to shut off the surveillance cameras and open the door "so his people could go in and he could handle his gang business with [them] inside." (3-ER-518-19.) Defendant further ordered Jung not to call the police regardless of "[w]hatever happens tonight." (3-ER-518.) Because Jung did not

comply with defendant's demands, defendant told him that his business was done and that defendant will eventually "do something" to Jung. (3-ER-519.)

Jung eventually stopped paying defendant because Jung believed defendant would hurt him whether or not he paid. (*Id.*) Jung learned that defendant was looking for him, and defendant even texted Jung, "I better not see you in K-Town, bitch." (3-ER-520, 522.) Jung then decided he "had to stay at home," and when he first reported defendant to the police, he wanted to be anonymous because he "was concerned about [his] safety," which was the same reason he had been paying defendant before that. (3-ER-537.)

***2. Defense theory***

In his opening statement, defendant asserted that he simply "organized" an "association" of karaoke bar owners and drivers, excluded new bars and drivers from the ongoing business, and informed his drivers about any issues happening at the bars. (2-ER-317.) He characterized the monthly payments as "union dues" for defendant's advocacy on behalf of the members. (2-ER-318.) According to defendant, paying those dues "meant that you got the call when

karaoke clubs had customers who were ready to pay for your girls." (2-ER-319.) Defendant also told the jurors to be skeptical of the victims' testimony because they were receiving benefits and had something to hide. (2-ER-320.)

In his closing argument, defendant reiterated these two themes. He referred to himself and his victims as "bros." (4-ER-805.) Defendant claimed to be collecting money "in exchange for running a group chat on [an app] and running off the competition and keeping the drivers fully employed without letting other drivers come in and dilute their opportunity for profit." (4-ER-808.) He argued these were "not some terrified victims," but rather "guys in this group chat . . . having shoptalk [and] relying on [defendant] to act as traffic control for their enterprise." (4-ER-820.) He further argued the victims should not be believed because they were receiving immigration benefits in exchange for their testimony. (4-ER-817-19.)

### *3. Verdict*

Defendant was charged with 55 counts of extortion based on Venmo payments to defendant from the victims. Count 56 charged attempted extortion based on the undercover extortion payment, and

Count 57 charged carjacking resulting in serious bodily injury to Yun Shin. (4-ER-877-85.)

The jury convicted on all counts. (CR-105.)

### *4. Sentencing*

After calculating the guidelines for each of the 57 counts of conviction (which did not group), the Presentence Report calculated a total offense level of 35 and criminal history category of I, for a range of 168-210 months. (PSR ¶ 570.) The highest adjusted offense level was 34 for the carjacking (Count 57). (PSR ¶¶ 475-490.) The second highest adjusted offense level was 27 for the extortion of Sang Shin in January 2023 when defendant punched Sang Shin and threatened to kill him (Count 31). (PSR ¶¶ 285-297.) The adjusted offense levels for the remaining counts were too low to factor into the guideline calculation, resulting in only a one-level enhancement under the multiple count adjustment. (PSR ¶¶ 491, 493.)

On appeal, defendant only challenges the two-level enhancement under U.S.S.G. § 3A1.1(b) because defendant knew or should have known that his victims were vulnerable. The Probation Office based its recommendation to apply that enhancement on the following facts:

"multiple victims did not speak English fluently, were undocumented. They were working in an industry where alcohol served at late hours was creating more danger" (1-ER-57), as well as their Korean nationality (*see* PSR ¶ 9). The government agreed and highlighted two extortion cases that applied vulnerable victim enhancements—*United States v. Bengali*, 11 F.3d 1207 (4th Cir. 1993), and *United States v. Shyllon*, 10 F.3d 1 (D.C. Cir. 1993). (1-ER-59-60.)

Defendant objected, arguing that the victims were no different from any other extortion victim and chose not to report defendant's crimes to the police "because they've got a good thing going and they don't want it to end." (1-ER-51-52.) According to defendant, "the whole vulnerable victim stuff is already contemplated in the sense that an extortion crime inherently involves a stronger, bigger person taking money that doesn't belong to them from a smaller, weaker person. Every victim of extortion is vulnerable or they wouldn't be extorted." (1-ER-49.)

The court found that all the victims were vulnerable, for a combination of reasons:

> The crimes in this case took place over an approximately five-year period between 2018 and March 16

> of 2023. [Defendant] extorted individuals that he curated, anywhere from 20 to 30 according to his Venmo records and the victims' statements. They were largely sole proprietors of businesses in Koreatown, part of a small, insular world of Korean karaoke bars, drivers, and hostesses. And all of the victims were either managers and drivers of hostesses catering to karaoke bars or managers of karaoke bars.
>
> All of the victims were Korean immigrants. Their command of English was weak. They lacked legal status in the United States, and they were unschooled in the American legal system. They were not the sorts of people in our country who would avail themselves of the protections that the law affords them. Go to court, secure protective orders, or call the police and demand protection and prosecution.
>
> Like so many first-generation immigrants, their primary focus was survival in a new land which in part required not drawing attention to themselves. [Defendant] knew exactly who his victims were, their vulnerabilities, and that their condition made them particularly susceptible to extortion.
>
> The defendant shared a common culture and language with them. The victims were entirely dependent on their small businesses, their automobiles, their hostesses, and their bar patrons to survive. The defendant knew this, and he knew that they would pay to keep working and keep their businesses alive so long as he inflicted just enough fear and intimidation and showed that he was capable of committing acts of violence.

(1-ER-65-66.)

The court sentenced defendant to 240 months on each of the extortion and attempted extortion counts and 270 months on the carjacking count. (1-ER-2.)

## IV

## SUMMARY OF ARGUMENT

First, the district court did not abuse its discretion in admitting videos of and testimony about defendant's uncharged shooting at a doumi driver in a karaoke parking lot during defendant's extortion scheme. The evidence was admissible both under Rule 404(b) and as inextricably intertwined with the charged offenses. For the Hobbs Act extortion counts, the government needed to prove intent to obtain money by the wrongful use or threat of force or fear, as well as the victims' reasonable fear of harm. Evidence of the shooting proved both. The district court also did not abuse its discretion in finding that the shooting's significant probative value was not substantially outweighed by unfair prejudice, as the violence was commensurate with the charged carjacking and evidence of other violence against karaoke workers. In any event, any error was harmless in light of the mountain of evidence of defendant's guilt.

Second, the district court did not plainly err or abuse its discretion in admitting Instagram posts broadcasting defendant's gang membership or expert testimony about the gang's extortion methods. Because defendant disputed his wrongful use of fear and violence to obtain the victims' money, evidence that defendant used gang connections to instill fear was relevant to his intent and knowledge. The gang expert's testimony likewise rebutted the defense that the payments were an innocent protection or association fee, when in fact the victims needed protection from defendant himself. Nor did the court abuse its discretion under Rule 403. The gang affiliation testimony was highly probative to rebut defendant's central defense that he was providing a legitimate service, and that probative value was not substantially outweighed by the danger of unfair prejudice. Finally, any error did not materially affect the outcome because there was ample evidence of defendant's threats and acts of violence apart from the gang evidence, and the evidence of guilt was otherwise overwhelming.

Third, the district court did not err, let alone plainly err, in excluding cross-examination about defendant's alleged texts warning

drivers about problematic doumis or potential raids at karaoke bars. When offered by defendant, his own texts unquestionably were hearsay. Defendant claims, for the first time on appeal, that he was not offering these messages for the truth but rather to show that he was attempting to organize the industry and charging for that service. However, the texts were relevant to show that he was not extorting the victims only if they were true. And again, any error was not prejudicial given Kang's testimony about sharing information through the group chat and the substantial evidence against defendant.

Fourth, the district court did not clearly err in imposing a vulnerable victim enhancement at sentencing. As defendant concedes, his victims "(a) were part of an insular community, (b) [were] undocumented, (c) did not speak English fluently, and (d) were unschooled in the American legal system." (AOB 41.) In extortion and other cases, this Circuit and others have upheld findings that similar traits, in the aggregate, made victims more susceptible to the crimes charged to support the sentencing enhancement for vulnerable victims.

# V

# ARGUMENT

## A. The District Court Did Not Abuse Its Discretion in Admitting an Uncharged Shooting That Furthered Defendant's Extortion Scheme

### *1. Standard of review*

Whether specific evidence falls within the scope of Federal Rule of Evidence 404(b) is reviewed de novo, while the district court's admission of "other act" evidence under Rules 403 and 404(b) is reviewed for abuse of discretion. *United States v. Lague*, 971 F.3d 1032, 1037 (9th Cir. 2020).

"Deference is the hallmark of . . . abuse-of-discretion review." *United States v. Tsarnaev*, 595 U.S. 302, 322 (2022) (cleaned up). Under that standard, a ruling must be affirmed so long as the district court (1) "identified and applied the correct legal rule," and (2) made factual findings that were not "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc).

### *2. Facts*

In July 2022, a driver dropped off two doumis at "On and Off" karaoke. (Trial Ex. 19.) In the parking lot, defendant pulled his sleeve

over his hand to avoid leaving fingerprints, leaned halfway inside that car, and spoke to the driver. (*Id.*) The karaoke bar owner, Ivan Day Kwag ("Kwag"), who was in the parking lot, testified that defendant "just appeared all of a sudden" with "his hands in [his] pocket," and defendant "was trying to check [the car] out because there [were] certain [driving] companies that he didn't like." (3-ER-599.)[5] Kwag went inside briefly and had his manager get the doumis back in the car. (3-ER-601.) Defendant walked away, the car drove off, and then a dark figure appeared from the direction that defendant had been seen walking and a gunshot rang out, breaking the car's glass and hitting a doumi in the neck. (Trial Ex. 20; 3-ER-601-02 (Kwag's testimony about seeing defendant exiting the parking lot at the top left of the video and about hearing gunshot); 3-ER-640-41 (responding officer's testimony).)

Within an hour, defendant called Kwag, who used the name "Roy," and asked about the security footage. (3-ER-591, 603-04.) Defendant's own text message corroborated Kwag's testimony. (*See* 3-ER-673

[5] Defendant's text messages that he had banned certain drivers from On and Off karaoke corroborated this testimony. (3-ER-671-72.)

(defendant texting that he heard police are "saying, Roy is helping me for that one incident").)

The district court ruled that evidence of this shooting was admissible under Rule 404(b). (1-ER-135.) The evidence helped prove material issues in the case—that "defendant had the intent and the opportunity to follow through on the violent threats" and "his knowledge that he was not charging, quote, 'protection fees' to protect the victims from others but was, instead, demanding payment and compliance with his orders based on fear of retribution by the defendant himself." (1-ER-136.)

Further, the court ruled, "shooting at a car occupied by another karaoke driver" was sufficiently similar to the charged carjacking—which alleged "that the defendant took a victim's car by means of force and violence and caused serious bodily injury"—to be admissible under Rule 404(b). (1-ER-136-37.)

Regarding the Rule 403 balancing, the court found the probative value of the evidence "significant" and determined that it was not substantially outweighed by the danger of unfair prejudice because it

was "not more inflammatory" and was "in proportion" to the charged carjacking. (1-ER-137-38.)

### *3. Legal background on extortion*

As relevant here, the Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear." 18 U.S.C. § 1951(b)(2). To obtain a conviction for Hobbs Act extortion, the government was required to prove: (1) the defendant induced someone to part with money or property by the wrongful use or threat of force or fear; (2) the defendant acted with the intent to obtain money or property by wrongful use or threat of force or fear; and (3) commerce from one state to another was or would have been affected in some way. *See United States v. Dischner*, 974 F.2d 1502, 1516 (9th Cir. 1992), *overruled on other grounds by United States v. Morales*, 108 F.3d 1031 (9th Cir. 1997) (en banc); *see also United States v. Marsh*, 26 F.3d 1496, 1500 (9th Cir. 1994).

The statute does not define "wrongful," but caselaw has defined that term to include both wrongful ends and wrongful means. *United States v. Koziol*, 993 F.3d 1160, 1168-69 (9th Cir. 2021). The ends are

generally wrongful if "the alleged extortionist has no lawful claim to that property." *United States v. Enmons*, 410 U.S. 396, 400 (1973); *accord Dischner*, 974 F.2d at 1516. As to means, the use of force or violence is inherently wrongful regardless of whether the defendant has a lawful claim to the property. *United States v. Daane*, 475 F.3d 1114, 1120 (9th Cir. 2007) ("You cannot beat someone up to collect a debt, even if you believe he owes it to you.") (cleaned up). "[E]xtortion cases based on force or violence generally involve wrongful 'means,' while extortion cases based on economic fear typically involve only allegations of wrong 'ends.'" *United States v. Villalobos*, 748 F.3d 953, 957 n.3 (9th Cir. 2014) (quotation omitted).

#### ***4. The district court did not abuse its discretion under Rule 404(b) because the uncharged shooting tended to prove a material point and was sufficiently similar to the charged conduct***

Under Rule 404(b), evidence of other crimes or acts is admissible if relevant to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). "Rule 404(b) is a rule of inclusion—not exclusion." *United States v. Curtin*, 489 F.3d 935, 944 (9th Cir. 2007) (en banc). It permits the admission of relevant evidence of other crimes or acts

except where such evidence proves "*only* criminal disposition." *United States v. Verduzco*, 373 F.3d 1022, 1026-27 (9th Cir. 2004) (quotation omitted).

Evidence is admissible under Rule 404(b) if it satisfies four criteria: "(1) the evidence tends to prove a material point; (2) the prior act is not too remote in time; (3) the evidence is sufficient to support a finding that the defendant committed the other act; and (4) (in cases where knowledge and intent are at issue) the act is similar to the offense charged." *United States v. Vo*, 413 F.3d 1010, 1018 (9th Cir. 2005) (cleaned up). Defendant disputes only the first and fourth requirements.

#### *a. The evidence tended to prove defendant's intent and knowledge, which were the central disputes at trial*

In deciding whether "other act" evidence is relevant to prove intent, this Court "defer[s] to the 'district judge's own experience, general knowledge, and understanding of human conduct and motivation.'" *Lague*, 971 F.3d at 1040 (quoting *Curtin*, 489 F.3d at 948). The government put forth evidence that defendant ruled the Koreatown karaoke bar industry with an iron fist, obtaining money from drivers

and bar owners by threatening and committing violence on his victims if they refused to pay him. For his part, as the district court observed, defendant undertook "a good deal of cross-examination of these witnesses concerning other possible schemes, for example, or reasons why the defendant was interacting with these drivers, essentially trying to create the impression that there was an innocent reason for this." (3-ER-584.)

Defendant's July 2022 shooting, which occurred in the midst of his extortion scheme,[6] tended to prove the government's version and rebut defendant's. Defendant—who had banned certain drivers from On and Off karaoke—approached a driver in the parking lot of that karaoke bar after he had just dropped off two doumis. As soon as the doumis returned to the car and the car drove away, defendant shot at the car. The jury could easily infer that the driver had been banned for failure to pay his extortion fees to defendant, and that defendant was seeking to obtain his payment and enforce his control over the industry through violence and threats of violence. The district court therefore did not

[6] The extortion payments alleged in the indictment occurred between November 2020 and March 2023. (4-ER-878-84.)

abuse its discretion in concluding that the shooting evidence tended to show that defendant intended to extort the victims, *i.e.*, use wrongful means, including violence and threats of violence, to obtain the payments.

Faced with facts similar to those here, the Seventh Circuit found no abuse of discretion in admitting prior uncharged extortions. *See United States v. Schweihs*, 971 F.2d 1302 (7th Cir. 1992). *Schweihs*, like this case, involved "street tax" payments to the defendants by a business owner and his assistant to protect themselves and their business from harm. *Id.* at 1309. In opening statement, one defendant in *Schweihs* argued that he never intended to instill fear in the victims, had no knowledge of their fear, and was only boasting or making chit-chat when he discussed his organized crime connections with the victims. *Id.* at 1312. Thus, as here, "[t]he critical issues for the jury were whether the payments . . . had been induced by wrongful use of threatened force or fear, . . . and whether the defendants were innocent collectors, or knew that the payments were the product of fear." *Id.* at 1310. In those circumstances, evidence of other extortions, including ones with death threats unlike the charged extortions, were admissible

under Rule 404(b) to prove intent to induce payment by instilling fear in the victims and knowledge that the payments were so induced. *Id.* at 1312.

Likewise, in a trial on charges that two brothers extorted a business partner of some portion of his share in the business, the First Circuit upheld the admission of testimony about the brothers' prior violent acts under Rule 404(b). *United States v. Tkhilaishvili*, 926 F.3d 1, 14-17 (1st Cir. 2019). That court found the evidence was "relevant to the defendants' intent to threaten [the victim]." *Id.* at 15.

As another example, when a defendant claimed that the alleged victim was paying him for another reason, "not in response to threats," the Eleventh Circuit upheld the admission of attempts to extort third parties to prove the defendant's "intent to obtain money from others through fear caused by the threat[s]." *See United States v. Aliaga*, 617 F. App'x 971, 974 (11th Cir. 2015) (citation omitted).

The analysis in these analogous extortion cases applies with equal force here.

Furthermore, "in cases of extortion based upon fear of violence[,] the facts of fear, actual or anticipated, and of its reasonableness, are

vital factors." *Carbo v. United States*, 314 F.2d 718, 740 (9th Cir. 1963). "An extortion conviction requires evidence that [the victim] possessed a reasonable fear of . . . harm. For attempted extortion, . . . what is important is that the defendant attempted to instill fear in the victim." *Marsh*, 26 F.3d at 1500-01 (cleaned up) (affirming conviction where there was sufficient evidence of "intent to extort money"). Thus, "evidence of the state of mind of a victim of a Hobbs Act extortion offense is admissible under Fed. R. Evid. 404(b)." *United States v. Montoya*, 945 F.2d 1068, 1078 (9th Cir. 1991) (citing cases and holding that statements of another person about defendant were admissible under Rule 404(b) to show reasonable basis for victim's belief). Sang Shin testified that he had heard defendant "had fired a gun" before the January 2023 incident in which defendant punched and threatened to kill him.[7] (3-ER-550 (admitted for the limited purpose of Sang Shin's state of mind and the effect it had on him).) Sang Shin was therefore afraid that defendant may have had a gun during the assault and paid defendant afterwards because Sang Shin was afraid. (3-ER-549-51.)

---

[7] The shooting at "On and Off" karaoke occurred six months earlier. (*See* 3-ER-596-97 (July 15, 2022).)

Defendant's shooting in a karaoke parking lot not only frightened Sang Shin but also was intended to frighten defendant's other victims. That Sang Shin heard about the shooting was more than just probable; it was part of defendant's plan to keep victims in line. Text messages confirmed the insularity of this industry and defendant's efforts to ensure drivers and bar owners knew the consequences of failure to pay. (SER-39 ("Elon" texting defendant that he "just heard that I need your authorization to operate the [driving] company"); SER-50 ("Jay" texting defendant that he heard that "everything was clear" and "saw all other drivers going" to a certain karaoke bar).) On one occasion, for example, Kang saw defendant carrying an assault rifle at a karaoke bar and told Jung about it. (3-ER-481.) Defendant helped ensure that this insular community knew about his violence against noncompliant drivers by boasting about it himself. In a group message with driving companies, he ordered them to "[a]sk next driver what happens" when someone "violate[s]" his rules. (3-ER-470.) Indeed, defendant even texted individual drivers to tell them about his assaults against Sang Shin and others. (*See, e.g.*, 3-ER-677-78 (defendant texting that he "socked [Sang Shin's] ass" and "socked [another victim's] bitch ass"); 3-ER-679

(defendant explaining that he "socked" Sang Shin because "[w]e have rules" and a second violation has "different consequences" from "just pay[ing a] penalty," and that he "punched [another driver] twice" who was not called to the karaoke bar).) Accordingly, the district court did not abuse its discretion in admitting the shooting as evidence of both intent and the existence and reasonableness of the victims' fear. *See Tkhilaishvili*, 926 F.3d at 16 (where victim actually learned of prior acts, or defendants had reason to believe victim would have learned of prior acts, evidence was relevant to the jury's assessment of the defendants' intent and the victim's reasonable belief in the defendants' threats of violence).

Finally, the district court did not abuse its discretion in admitting evidence of defendant's shooting to prove his identity as the perpetrator of the charged carjacking.[8] Where past crimes have a "signature" characteristic shared with charged crimes, evidence of the prior crime is "relevant and reliable to show the identity of the perpetrator." *United States v. Quinn*, 18 F.3d 1461, 1466 (9th Cir. 1994) (citations omitted).

---

[8] Unlike the carjacking videos, defendant's face was clearly visible in the shooting videos.

At trial, defendant challenged the accuracy of Yun Shin's identification of defendant as the person who instructed and participated in his beating and stole his car. Evidence that defendant shot at another doumi driver outside a karaoke bar for similar reasons was sufficiently distinctive to demonstrate that Yun Shin's identification of defendant was not mistaken. *See United States v. Andreis*, 802 F. App'x 272, 275 (9th Cir. 2020) (affirming decision to admit evidence of other burglaries to prove identity in bank burglary case because "[s]uch rooftop robberies were rare occurrences and involved a number of very unusual characteristics"); *United States v. Tai*, 994 F.2d 1204, 1209 (7th Cir. 1993) (upholding admission of evidence of how the defendant collected other loans by extortionate means to prove the defendant's identity as the person responsible for the victim's attack in the charged conduct).

***b. The acts are similar***

To be admissible under Rule 404(b), "past conduct need not be identical to the conduct charged, but instead need only be similar enough to be probative of intent." *United States v. Johnson*, 132 F.3d 1279, 1283 (9th Cir. 1997) (citations omitted). The similarity between the uncharged shooting and the charged carjacking was not, as

defendant contends (AOB 23), merely that both involved violence. Rather, both the carjacking and the uncharged shooting occurred in karaoke bar parking lots to send a message to doumi drivers who failed to pay defendant and follow his rules. The similarity of the type of victim and location, as well as defendant's comparable motive and method of control in each instance, made the shooting probative for a non-propensity purpose, namely, to establish defendant's intent to extort money through violence and fear. *E.g.*, *United States v. Van Metre*, 150 F.3d 339, 350-51 (4th Cir. 1998) (prior rape of separate woman was sufficiently similar to render it probative of intent to sexually assault charged victim, where both assaults took place in the woods and both victims resembled each other in age and appearance); *United States v. Winters*, 729 F.2d 602, 604 (9th Cir. 1984) (in prosecution for kidnapping and transporting women in interstate commerce for immoral purposes, testimony showing that defendant had similarly beaten, raped, and forced young women into prostitution previously was admissible to establish defendant's modus operandi, motive, and intent).

### 5. *The district court did not abuse its discretion under Rule 403*

Since "trial judges are better able to sense the dynamics of a trial than [appellate courts] can ever be," they exercise "broad discretion . . . in balancing probative value against prejudice," and this Court "generally will not disturb such a ruling unless it lies beyond the pale of reasonable justification under the circumstances." *United States v. Espinoza-Baza*, 647 F.3d 1182, 1189 (9th Cir. 2011) (cleaned up). Additionally, "[a]pplication of Rule 403 must be cautious and sparing . . . because the Rule's major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *United States v. Plascencia-Orozco*, 852 F.3d 910, 926 (9th Cir. 2017) (quotation marks and quotation omitted).

Here, the shooting's probative value was significant, as the district court properly found. (1-ER-137-38.) The trial largely concerned the disputed element of defendant's intent to extort. *See United States v. Cox*, 963 F.3d 915, 925 (9th Cir. 2020) (probative value of prior act was substantial where it included significant evidence concerning sole contested issue at trial).

In evaluating unfair prejudice under Rule 403, "[o]ther-act evidence should be considered in the context of each case," including other admitted evidence. *Id.* (no abuse of discretion where prior act no more prejudicial than evidence of charged offense); *see also United States v. Jayavarman*, 871 F.3d 1050, 1064 (9th Cir. 2017) ("[probative] value was not substantially outweighed by any risk of unfair prejudice that might have arisen from the evidence, especially in the context of other evidence adduced at trial").

Although a doumi in the car was injured during the shooting, the district court's findings that the shooting was "in proportion with the offense of carjacking" and that "[t]he evidence is not more inflammatory than the evidence of the charged offenses" (1-ER-138) were well-supported by the record and not clearly erroneous. The jury saw video of defendant and his accomplice mercilessly beating Yun Shin with metal baseball bats during the carjacking and heard from Yun Shin that defendant broke Yun Shin's arm when Yun Shin raised it up to protect his head. (Trial Exs. 10-11; 2-ER-419.) Just from looking at his body, Yun Shin's doctor knew he received "pretty serious blows." (2-ER-395.) The happenstance that the person who ended up being injured

during the shooting was a doumi rather than the driver did not make the shooting materially more emotionally charged or inflammatory than evidence of the charged offenses.[9]

Furthermore, the district court promised to, and did, give "the jury a limiting instruction as to how the evidence is to be used to eliminate the risk of any of the dangers that are set forth in Rule 403." (1-ER-138; *see also* 3-ER-764; 4-ER-766.) "This court has recognized the effectiveness of a properly-worded limiting instruction on numerous occasions." *United States v. Hankey*, 203 F.3d 1160, 1173 n.11 (9th Cir. 2000) (citing cases); *see also United States v. Berckmann*, 971 F.3d 999, 1004 (9th Cir. 2020) (highlighting limiting instruction in upholding admission of prior assaults under Rule 403).

[9] Defendant's efforts at trial to portray those working in the karaoke bar industry as illegitimate and unworthy of protection failed. When defendant tried to elicit such information on cross-examination, Yun Shin testified that he and Lee incorporated their company in the State of California. (2-ER-440; *see also* 2-ER-351 (Lee testifying, "We had the corporation LLC").) Their company was never cited by police for any violations, illicit drug use, or prostitution. (2-ER-460.) Yun Shin was lawfully permitted to work in the United States when they were operating their company. (2-ER-440.) Lee paid his taxes annually. (2-ER-349.) Jung testified that his karaoke bar had a liquor license. (3-ER-533.)

### *6. Alternatively, defendant's shooting was inextricably intertwined with the charges*

Evidence of a defendant's other acts is "inextricably intertwined" with a charged crime, and thus falls outside Rule 404(b), if it either: (1) "constitute[s] a part of the transaction that serves as the basis for the criminal charge," or (2) is "necessary . . . to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." *United States v. Dorsey*, 677 F.3d 944, 951 (9th Cir. 2012) (cleaned up). For example, in *Dorsey*, the defendant shot at the window of a witness's apartment, hitting her. *Id.* at 949. This Court held that evidence that another witness had seen the defendant in the months before the shooting with a gun of the same or similar type as the one used in the shooting was inextricably intertwined with the charged witness tampering and gun offenses because the testimony "bore directly on the commission of the charged crimes" and formed part of the government's "coherent and comprehensible story regarding the commission of the crime." *Id.* at 952 (citation omitted).

Evidence of an uncharged assault that a defendant committed seven years before extorting the same victim has been held admissible without needing to satisfy Rule 404(b), where the assault was an

inextricable part of the story of extortion, including why the victim feared the defendant. *See United States v. Melicharek*, 360 F. App'x 223, 225-26 (2d Cir. 2010). Similarly, this Court has upheld assaults as "inextricably intertwined" with human trafficking charges where "the assaults were the means by which defendant maintained the necessary control over his victims so as to carry out the crimes charged," and evidence of such "allowed the government to present a coherent and comprehensible story about what took place," particularly where it refuted a defense theory. *United States v. Williams*, 291 F.3d 1180, 1189-90 (9th Cir. 2002) (per curiam) (citation omitted), *overruled on other grounds by United States v. Gonzales*, 506 F.3d 940 (9th Cir. 2007) (en banc).

Here, because Sang Shin heard about the shooting, which contributed to his fear of defendant, it was part of the story of defendant's extortion of him. And in the larger context of defendant's extortion of other drivers and karaoke bar owners, the shooting allowed defendant to solidify his power to extort money from anyone working in the karaoke industry. Put simply, defendant did not demand payment from these victims in a vacuum. As the shooting evidence was "used to

flesh out the circumstances surrounding the crime with which the defendant ha[d] been charged, thereby allowing the jury to make sense of the testimony in its proper context," it was inextricably intertwined with the charged offenses. *United States v. Ramirez-Jiminez*, 967 F.2d 1321, 1327 (9th Cir. 1992).

The shooting was further "inextricably intertwined" with the extortion charges because it "tend[ed] to show that [the defendant's] numerous threats were real and that [he] had the wherewithal to carry them out." *United States v. Gilley*, 836 F.2d 1206, 1214 (9th Cir. 1988) (admitting guns found in the defendants' home and car as relevant to the charges of using extortionate means to collect extension of credit without applying Rule 404(b)).

In sum, defendant's challenge to the shooting evidence fails on the alternative ground that this evidence was inextricably intertwined with the charges. *See United States v. Mixon*, 930 F.3d 1107, 1110 (9th Cir. 2019) (this Court may affirm on any basis supported by the record, even if not relied upon by the district court).

### 7. *Any error was harmless*

"The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986) (internal citation omitted). Any error in admitting the shooting evidence was harmless in light of the other evidence overwhelmingly proving that defendant obtained purported protection fees from doumi drivers and karaoke bar owners by committing violence and threatening violence and economic harm.

The jury received a wealth of evidence contradicting defendant's trial theory and supporting the government's. All five extortion victims testified about their fear of defendant. Yun Shin said he and his partner Lee were paying defendant "[b]ecause [they] were scared of him." (2-ER-402.) Lee confirmed that he paid defendant because of his "fear." (2-ER-327.) Sang Shin said that he paid defendant "[b]ecause [he] was afraid." (3-ER-551.) Kang explained that he "had no other

choice but [to pay defendant] in order . . . to work" because otherwise defendant "would come in and beat [him], or he would do something to [him] physically." (3-ER-471, 475.) Jung likewise testified that he paid defendant "[b]ecause he threatened that if we don't pay, we'll lose business, and he will do something to us," meaning "[p]hysical harm." (3-ER-513.) In fact, defendant personally threatened each victim. (2-ER-331, 370 (Lee); 2-ER-410 (Yun Shin); 3-ER-549 (Sang Shin); 3-ER-474-75 (Kang); 3-ER-513, 535 (Jung).) He also physically attacked Yun Shin (2-ER-411) and Sang Shin (3-ER-548) and physically attacked others in front of Kang (3-ER-479-80). The jury saw defendant physically attack Yun Shin and the others on video (*see* 2-ER-412-17; 3-ER-476-80) and read defendant's own admissions to attacking Sang Shin and others (3-ER-677-79).

The jury also read all about defendant's extortion in his own text messages. For example, after setting out the $1,600 startup fee followed by a $200 monthly fee, defendant "banned" a victim and instructed him to "Venmo or CashApp me." (3-ER-667-68.) He told another victim, "No more Concert [karaoke]. No more Forest [karaoke]." (3-ER-670.) After confirming a victim went to Soopsok or

Forest karaoke against defendant's rules, defendant told him, "You choose you ban for two weeks or 500 . . . . Ban. And I come see you." (3-ER-675.) He told another victim, "I need this month . . . . And penalty. Or you want to face the consequence? You pick." (*Id.*) Defendant also said, "Either I kick you out of K-Town, or you pay the fine." (*Id.*) Defendant asked another victim, "You wanna get beat-up or pay penalty?" (3-ER-678.) He also said, "[Y]ou need to pay penalty 'cause I don't want to punch you this time." (*Id.*) Defendant said that he "socked" Sang Shin because "[w]e have rules, you know. First time, just pay penalty, but from second time, different consequences." (3-ER-679.)

Furthermore, as Yun Shin, Lee, and Jung testified, defendant was not providing any service for the fees he demanded. (*See* 2-ER-384, 402, 522.) The karaoke bars—not defendant—contacted the drivers directly to bring doumis. (2-ER-324-25, 383; 3-ER-524.) And the doumis paid the drivers directly. (2-ER-323.)

There was also considerable gun-related evidence found during the search of defendant's home the day after his final extortion of Kang and the day of his final extortion of Sang Shin. At that time, defendant

had multiple firearms equipped with a scope, a drum magazine to hold many rounds of ammunition, and other accessories beyond personal safety at home. (3-ER-681-87.)

Defendant's minor disputes do not undermine the quality or compelling nature of the government's evidence. (*See* AOB 32.) Although the government's victim witnesses were undocumented immigrants, defendant's contention that they all benefitted by receiving immigration benefits is contrary to the record. Yun Shin and Lee were offered U Visa certifications to support a U Visa application—*after* they initially reported defendant's crimes to law enforcement, not to procure such reporting—but both of them turned down those certifications to pursue other paths to citizenship. (2-ER-322-23, 348-50, 383 (Lee's testimony); 2-ER-441-42, 459-60 (Yun Shin's testimony).) Both Kang and Jung testified that they had no immigration status, but defense counsel declined to discuss any U Visa certification with them, likely because the government had not offered any. (*See* 2-ER-463 (Kang's testimony); 3-ER-510 (Jung's testimony).) Sang Shin was the only victim witness who accepted the U Visa certification, although he did

not believe he was "going to get a visa for testifying in this case." (3-ER-571-73.)

Similarly, slight inconsistencies in the carjacking evidence do not undermine the jury's verdict that defendant participated in or aided and abetted that offense. First, Yun Shin testified that he recognized defendant not only by his eyes, but also his voice when he was screaming, "Fuck him up. Fuck him up." (2-ER-416-17.) Second, before arriving at the hospital, Yun Shin told Los Angeles Police Department ("LAPD") officers that one Black man and one Korean man robbed him. (2-ER-429-31.) The afternoon after the attack, Yun Shin told another LAPD officer that defendant was the one who carjacked him. (2-ER-422.) And when Lee rescued Yun Shin from the carjacking, Yun Shin "repeatedly" said, "It was [defendant]." (2-ER-336; *see also* 2-ER-381 (confirming on cross-examination that when Lee "retrieved him that night," Yun Shin told Lee "that he'd been beaten by [defendant]").)

The circumstances surrounding Yun Shin's beating and the carjacking strongly buttress defendant's identity as a participant. After defendant threatened Yun Shin in his car at a karaoke bar, Yun Shin did not pay defendant. (2-ER-460-61.) Within a few weeks, two men

violently carjacked Yun Shin at another karaoke bar. (2-ER-461.) Lee also heard Yun Shin on the phone repeatedly yelling, "I will pay you." (2-ER-334-35.) Defendant was the person demanding money from Yun Shin and who had a motive to ambush and viciously attack him in a karaoke bar parking lot.

The only contrary evidence was from the LAPD officer defendant called to testify, who met with Yun Shin at the hospital shortly after the attack, when he was under two high doses of the strongest pain medication that the hospital could give. (*See* 2-ER-395; 3-ER-731-32.) She testified that she had no independent recollection of meeting Yun Shin but that, based on the report her partner wrote (which even she deemed to be hearsay), Yun Shin said that "two male Blacks" had beaten him up. (3-ER-730-37.) That flimsy testimony, in the context of the significant evidence pointing to defendant as the perpetrator, does not suggest that acquittal was likely absent the shooting evidence.

The jury convicted on all counts. Defendant's suggestion that those across-the-board guilty verdicts on 57 differing counts is attributable to the jury's consideration of one violent episode—rather

than years of violent, alarming, and threatening conduct—strains credulity.

## B. The District Court Did Not Plainly Err or Abuse Its Discretion in Admitting Evidence of Defendant's Gang Affiliation

### *1. Facts*

Several victims testified about defendant's gang affiliation. Jung heard defendant was in a "Black gang" called "Grape Street." (3-ER-516.) Yun Shin also heard that defendant was in the "Grape Street Crips." (2-ER-403.) Sang Shin knew it as "Grape." (3-ER-550.) Further, defendant himself told Lee that "he was in a gang," which played into Lee's fear of defendant and why Lee paid him. (2-ER-327, 329, 341.) Defendant agrees this testimony was admissible and does not challenge it on appeal. (AOB 29.)

Lee further testified that he saw pictures on defendant's Instagram of defendant with gangsters, some holding guns, which made him fear defendant even more. (2-ER-342.) After he left the industry, Lee took screenshots of these images (4-ER-870-76) and provided them to law enforcement (2-ER-329, 342).

The government also presented expert testimony from a police officer, Jacob Rice, about the Grape Street Crips. (3-ER-619-37.) Rice reviewed the photos Lee obtained from defendant's Instagram and identified gang colors, hand signs, logos, the names of groups within the Grape Street Crips (Baby Loc and Peda Roll Mafia), and other gang-related terms in those photos. (3-ER-625-32.) Rice also identified many of defendant's tattoos as related to the Grape Street Crips (3-ER-634-36) and testified that the Grape Street Crips extort protection fees from businesses within the area they control (3-ER-619-21).

Defendant filed a motion in limine to exclude the expert's testimony, arguing that it was not relevant because gang members were not involved in the charged crimes. (SER-7-10.) The government argued that evidence of defendant's reputation and involvement in a gang was relevant to the victims' fear, and in light of the defense, the expert could explain how defendant was portraying himself in his social media posts. (1-ER-112-13.)

At a pretrial hearing, the district court concluded the evidence was relevant to prove use of actual or threatened force, violence and fear. (1-ER-118.) Under Rule 403, the court found that the probative

value was not substantially outweighed by any prejudicial effect. (1-ER-119.) The court conditionally admitted the testimony but stated that it wanted to hear the victim testimony first. (1-ER-117.)

At trial, defendant again objected to the expert testimony, arguing that it was not relevant to the victims' state of mind. (3-ER-580-82.) The district court reaffirmed its prior ruling, noting that the charges involved use of force, violence, and fear; the evidence gave the jury context, especially in light of the defense that there was an innocent explanation for defendant's interactions with the drivers. (3-ER-584-85.)

Defendant did not object to the Instagram posts in his motion in limine (SER-4-11) or at the time they were offered in evidence (2-ER-342-43).

***2. Standard of review***

Admission of expert testimony is reviewed for abuse of discretion. *United States v. Johnson*, 875 F.3d 1265, 1280 (9th Cir. 2017).

When a defendant fails to specifically object to admission of evidence, such as defendant's Instagram posts, review is for plain error. *United States v. Olivas*, 150 F.4th 1107, 1113 (9th Cir. 2025) ("[A] party

must object to the precise testimony under review.”). Plain error requires the defendant to show: (1) error, that is (2) clear or obvious, (3) affects substantial rights, and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732-37 (1993).

This Court “give[s] great deference to district courts when considering the admissibility of gang-affiliation evidence.” *United States v. Gomez*, 6 F.4th 992, 1006 (9th Cir. 2021).

#### *3. The district court did not plainly err in admitting defendant’s Instagram posts*

Defendant concedes that the victims’ testimony about their belief that defendant was a gang member—specifically, a Grape Street Crips member—was admissible to show that defendant induced victims to make monthly payments through fear of physical or economic harm. For the same reason, admission of defendant’s Instagram posts was not an abuse of discretion; certainly, it was not clearly or obviously erroneous.

In extortion cases, a defendant’s reputation is relevant to the fear element. *United States v. Harris*, 916 F.3d 948, 958 (11th Cir. 2019); *United States v. Fazio*, 770 F.3d 160, 165 (2d Cir. 2014). Where, as

here, a defendant disputes wrongful use of fear to obtain the victim's money, evidence that a defendant used gang connections to instill fear is relevant to the defendant's intent and knowledge. *Fazio*, 770 F.3d at 164-65 (evidence that defendants were reputedly connected to Mafia properly admitted). Here, defendant's Instagram posts served to intimidate his victims not only by depicting defendant as willing to engage in violence, but also by portraying himself as having other gang members for muscle if his victims did not pay.

Furthermore, a significant theme of the defense was that the victims were not credible because they were receiving immigration benefits and had something to hide. Because "seeing is believing," photographs reflecting that defendant was indeed affiliated with the Grape Street Crips were admissible because they strongly corroborated the victims' testimony about defendant's gang affiliation and possession of guns, and their fear of him on those grounds. *See United States v. Perrotta*, 289 F.3d 155, 166 (1st Cir. 2002) (in extortion case, jury seeing actual weapons corroborated testimony about their existence and thus was appropriate).

Defendant argues the Instagram photos were inadmissible because they "had not been seen by the government's witnesses during the extortion." (AOB 29.) That is not clear from the record—although Lee took the screenshots after the carjacking (2-ER-329-30), he also testified that defendant "would post [an Instagram story] every day," suggesting that Lee had previously viewed defendant's Instagram account (2-ER-337).

But even if Lee had not seen the Instagram posts until after he decided to leave the industry, they were nonetheless relevant to show defendant's efforts to use social media to cultivate fear in other victims (particularly given the relatively small size and insular nature of the karaoke bar owner/manager/driver community) and to rebut defendant's claim that he was merely providing a legitimate service. Because defendant's extortions continued through March 2023, evidence demonstrating defendant's reputation as a gangster remained relevant to his knowledge and intent to obtain money to which he was not entitled through fear and violence.

Finally, defendant cannot show that any obvious error affected both his substantial rights and the fairness, integrity, or public

reputation of judicial proceedings. The victims themselves testified about their fear of defendant in part due to his self-proclaimed membership in a dangerous Black gang. (*See, e.g.*, 2-ER-341, 403; 3-ER-516.) The jury also heard evidence about firearms, accessories, and ammunition seized from defendant's home (3-ER-684-87), his possession of a large firearm at "Soopsok" karaoke and his violence against Sang Shin and another driver and waiter at Soopsok (3-ER-476, 480, 497, 548), and his threatening text messages (*e.g.*, 3-ER-470-71, 679). In light of the victim testimony and other compelling evidence that defendant induced the victims' payments through fear and violence, defendant cannot show the Instagram posts "affected the outcome of the district court proceedings." *Olano*, 507 U.S. at 734 (citations omitted).

#### 4. Admitting the gang expert's testimony was within the district court's discretion

##### a. The gang expert testimony was highly probative

"Both the Supreme Court and this court have ruled that evidence of gang affiliation is admissible when it is relevant to a material issue in the case." *Gomez*, 6 F.4th at 1005 (quotation omitted). In *Gomez*, after other evidence of the defendant's gang membership was introduced, a law enforcement expert testified that gang members arm

themselves to protect against being robbed, to collect debts, and to assault law enforcement officers. *Id.* at 1000. This Court found the evidence admissible to rebut an entrapment defense because "evidence that Gomez had the reputation of having a leadership position in gangs that are heavily involved in drug trafficking, and regularly use guns to facilitate such trafficking, is relevant to rebut Gomez's theory that he had no prior inclination to be involved in drug trafficking and to possess a firearm." *Id.* at 1005-06.

Likewise, expert testimony about the practices of the Grape Street Crips was admissible and highly probative here. Through cross-examination, as the district court observed, defendant was "trying to create the impression that there was an innocent reason" for his actions towards the victims. (3-ER-584.) The gang expert's testimony rebutted that claim—first by identifying defendant's tattoos and the gang indicia in defendant's Instagram posts, which confirmed defendant's affiliation with the Grape Street Crips, and then by explaining the gang's modus operandi. As the expert explained, the Grape Street Crips, with which defendant claimed to be associated, represent their extortion demands as a "protection fee." (3-ER-620.) He described how these protection

schemes work, including that the Grape Street Crips promise to protect victims from violent crime so long as the victims make regular payments, but in fact the gang members are simply refraining from attacking the victims themselves. (3-ER-620-21.) The expert further testified these schemes are successful in part because the Grape Street Crips target victims who live in the tightknit community, without omnipresent law enforcement, or engage in illegal or unregulated activities themselves. (*See* 3-ER-620-23.) The expert testimony thus provided context for the jury to determine the primary issue disputed at trial—whether, like the Grape Street Crips, defendant was engaged in an extortion scheme, or whether he was collecting money for providing a legitimate service.

Contrary to defendant's contention, the expert testimony was not admitted for an improper purpose. The government need not charge a defendant with conspiracy to introduce expert testimony about a criminal organization. *See United States v. Valencia-Amezcua*, 278 F.3d 901, 909 (9th Cir. 2002). Rather, "[g]overnment experts may testify as to the general practices of criminals to establish the defendants' modus operandi[,] which helps the jury to understand complex criminal

activities, and alerts it to the possibility that combinations of seemingly innocuous events may indicate criminal behavior." *United States v. Anchrum*, 590 F.3d 795, 804 (9th Cir. 2009) (cleaned up); *see also United States v. Johnson*, 735 F.2d 1200, 1202 (9th Cir. 1984) (citing cases).

Defendant's attempt to categorically exclude gang evidence as relevant to proof of intent to extort also fails. (*See* AOB 27.) In *Mitchell v. Prunty*, this Court overturned a gang member's conviction resting on the theory that the defendant aided and abetted a murder by "fanning the fires of gang warfare"; that argument amounted to "guilt by association." 107 F.3d 1337, 1342 (9th Cir. 1997), *overruled on other grounds by Santamaria v. Horsley*, 133 F.3d 1242 (9th Cir. 1998); *see also United States v. Garcia*, 151 F.3d 1243, 1245-46 (9th Cir. 1998) (gang's general agreement to support one another in gang fights insufficient to establish conspiracy to assault).[10] However, the government's theory of liability here was not based on gang

---

[10] Defendant also cites *Kennedy v. Lockyer*, 379 F.3d 1041 (9th Cir. 2004), but "*Kennedy* . . . did not address an evidentiary challenge to gang affiliation evidence." *United States v. Rodriguez*, 766 F.3d 970, 987 (9th Cir. 2014).

membership alone or guilt by association. Instead, gang affiliation was relevant to show defendant's attempts to instill fear, which supported his intent to obtain money through threats and violence rather than by providing a legitimate service to an unregulated industry.

#### ***b. The district court did not abuse its discretion under Rule 403***

Rule 403 permits exclusion of "relevant evidence" only if "its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. Evidence is unfairly prejudicial "if it has an undue tendency to suggest a decision on an improper basis such as emotion or character rather than evidence presented on the crime charged." *United States v. Joetzki*, 952 F.2d 1090, 1094 (9th Cir. 1991). Unfairness must be premised on the "non-probative aspect" of the challenged evidence—its tendency to "affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged." *United States v. Bailleaux*, 685 F.2d 1105, 1111 & n.2 (9th Cir. 1982); *accord United States v. Yazzie*, 59 F.3d 807, 811 (9th Cir. 1995). Thus, while the gang expert's testimony undercut defendant's claim that he was simply a businessman bringing order to the karaoke industry, that is not *unfair* prejudice.

Although evidence of gang affiliation carries some inherent prejudice, *see United States v. Abel*, 469 U.S. 45, 52-53 (1984) (admitting evidence of gang affiliation); *United States v. Takahashi*, 205 F.3d 1161, 1164 (9th Cir. 2000) (same), the risk of unfair prejudice was minimal here. This Court has recognized that such risk is limited where, as here, "the jury was not oblivious to the lifestyle of the defendant[]" through other evidence. *Hankey*, 203 F.3d at 1173. The gang evidence reinforced the reputation for violence that defendant cultivated, but there was ample other evidence, including videos and defendant's own text messages, showing that defendant sought to enforce payment of extortion fees through threats and violence.

On the other side of the balance, the gang expert testimony was highly probative because it rebutted defendant's central defense of being a community organizer and also helped provide context for the charged offenses. At a minimum, any unfair prejudice did not *substantially* outweigh the probative value of this evidence. *See United States v. Mende*, 43 F.3d 1298, 1302 (9th Cir. 1995) (exclusion under Rule 403 is "an extraordinary remedy to be used sparingly"; "the danger

of prejudice must not merely outweigh the probative value of the evidence, but *substantially* outweigh it" (quotation mark omitted)).

### 5. *Any error was not prejudicial*

Even if this Court were to conclude that some or all of the gang evidence should not have been admitted, there was no reversible error. Where a non-constitutional error occurs, this Court must affirm if "it is more probable than not that the error did not materially affect" the outcome. *United States v. Torres*, 794 F.3d 1053, 1063 (9th Cir. 2015).

"Review for harmless error requires not only an evaluation of the remaining incriminating evidence in the record, but also the most perceptive reflections as to the probabilities of the effect of error on a reasonable trier of fact." *Id.* (fact that first trial resulted in a hung jury does not automatically establish prejudice). "In reviewing criminal cases, it is particularly important for appellate courts to relive the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure. To turn a criminal trial into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution." *United States v. Young*, 470 U.S. 1, 16 (1985) (quoting *Johnson v. United States*, 318

U.S. 189, 202 (1943) (Frankfurter, J., concurring)). Any error here was harmless, and did not affect substantial rights or the fairness of the proceedings, because there was ample evidence of defendant's threats and acts of violence apart from the gang evidence, and the evidence of guilt was otherwise overwhelming. (*See* Section V(A)(7), *supra*.)

## C. The District Court Did Not Plainly Err in Sustaining Objections to Lee's Cross-Examination

### *1. Facts*

During Lee's cross-examination, defense counsel asked if Lee would "get texts in the Kakao[11] chat room about certain things going on at the different karaoke clubs, like a club was going to be raided by the police that night" and "about certain doumis that were troublemakers who shouldn't be sent to different clubs." (2-ER-366.) The district court sustained the government's relevance and hearsay objections. (*Id.*) Counsel then reframed the questions and asked whether "[defendant] would send you texts as part of the group chat to warn you if there was a particular doumi who was bringing drugs to the clubs." (2-ER-367.) He also asked, "As a result of paying [defendant] to be in the group

[11] KakaoTalk is a Korean messaging app.

chat, you would be informed about certain clubs that were better to go to than other clubs, correct?" (*Id.*) The court sustained objections on the same two grounds. (*Id.*)

Kang was part of the Kakao group chat, which he described as a one-sided forum for defendant to let drivers know his rules as to what they should and should not do. (3-ER-486.) During Kang's cross-examination, defense counsel asked Kang about defense exhibit 202, which was a chat excerpt in which Kang advised others not to hire a certain doumi who got caught selling drugs and had payment issues. (3-ER-489, 493-95; SER-60.) On the same page as, but a different date from, Kang's texts, defendant sent an image and wrote, "What company she works for?" and "Let me know asap. It's urgent." (SER-60.) When defendant moved to admit exhibit 202 and elicit defendant's own messages on the page, the court sustained the government's hearsay objections. (3-ER-490-91.) At sidebar, the district court pointed out that counsel was asking the witness about defendant's statements, which were hearsay. (3-ER-492.) Defense counsel then offered to redact defendant's statements, arguing that Kang's message was relevant to rebut the drivers' testimony that they got nothing of value

for paying defendant, and the court admitted the redacted exhibit.[12] (3-ER-492-93; *see* SER-59.)

Defendant never argued, with respect to either Lee or Kang, that defendant's statements should be admitted because they were not offered for the truth.[13]

### *2. Standard of review*

Because defendant never alerted the district court to his specific claim that defendant's statements were not hearsay because they were not offered for the truth, review is for plain error. *Olivas*, 150 F.4th at 1113 (defendant must "put the district court on notice of the specific ground raised on appeal" (citation omitted)).

### *3. Defendant's own statements were either hearsay or irrelevant*

As the district court correctly noted at sidebar, defendant's own statements in the chats were hearsay when offered by defendant.

---

[12] During Lee's cross-examination, defense counsel showed him defense exhibit 202. Lee had left the industry two years earlier and testified that he accordingly "wasn't present in this chatting room" and did not receive that group message. (2-ER-366.)

[13] Defense counsel stated only that he was not offering Kang's portion of exhibit 202 for the truth of the matter asserted. (3-ER-491.)

*United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000) ("The self-inculpatory statements, when offered by the government, are admissions by a party-opponent and are therefore not hearsay, *see* Fed. R. Evid. 801(d)(2), but the non-self-inculpatory statements are inadmissible hearsay.").[14] However, defendant argues for the first time on appeal that he "was trying to show that [he], rather than extorting the victims, was attempting to organize the business and charged for his services." (AOB 34 (citing 2-ER-366-67).) As such, defendant argues, the evidence he was hoping to elicit from Lee was not hearsay because it was not offered for the truth of the matter asserted but "only went to the question [of] whether or not the victim received information." (*Id.*)

Defendant, however, relies upon cases that are inapposite. In *Anderson v. United States*, the statements were introduced to show they were false, not true. 417 U.S. 211, 219-20 (1974). And in *United States v. Lopez-Alvarez*, the defendant sought to elicit that details of the crime

[14] It is unknown whether Lee's answers would have been exculpatory, but of course if they were inculpatory, then any error in excluding them was harmless.

had been discussed by others in the defendant's presence, such that the defendant could have learned the specific details he later related to Drug Enforcement Administration agents without having been a participant in the crime. 970 F.2d 583, 587 (9th Cir. 1992). Those cases are materially different. Here, defendant was not seeking to show that statements he made in the Kakao chat were false or to demonstrate how he learned the information he posted in the group chat. On the contrary, defendant was seeking to elicit evidence that defendant was providing a service by sending out useful information to those working in the karaoke bar business. In other words, the evidence defendant was seeking to elicit was only relevant if it was offered for the truth.[15] If defendant had been posting jokes or word puzzles, the evidence would not have been probative of the issues at trial. *See United States v. Sanchez-Lopez*, 879 F.2d 541, 554-55 (9th Cir. 1989) ("The statement . .

[15] By not challenging the sustained relevance objections, defendant has waived such challenge. *See United States v. Perez-Silvan*, 861 F.3d 935, 939 (9th Cir. 2017) ("[O]n appeal, arguments not raised by a party in its opening brief are deemed waived."); *United States v. Kelly*, 874 F.3d 1037, 1051 n.9 (9th Cir. 2017) ("We decline to consider this argument because Kelly waived it by failing to raise it in his opening brief.").

. had negligible probative value for the proof of any fact at issue at trial, unless it was offered for the truth of the matter asserted . . . . Because the government failed to lay a foundation that the hearsay statement had any probative value apart from the improper purpose of establishing the truth of the matter asserted, the district court abused its discretion in admitting it 'to establish what was said.'" (citation omitted)).

"If the district court were to have ruled in his favor, [defendant] would have been able to place his [supposedly] exculpatory statements before the jury without subjecting himself to cross-examination, precisely what the hearsay rule forbids." *Ortega*, 203 F.3d at 682 (cleaned up). There was no error, let alone plain error.

#### ***4. Any error was not prejudicial***

Under plain error review, defendant bears the burden of demonstrating prejudice. *Olano*, 507 U.S. at 734. Defendant cannot do so because there is no reason to think that Lee's answers would have resulted in a different verdict. The evidence against defendant was substantial, and the evidentiary weight of any hypothetical answers was not. *See United States v. Larson*, 495 F.3d 1094, 1107-08 (9th Cir.

2007) (en banc) (discussing the factors to be considered when assessing harmless error); *see also Gentry v. Sinclair*, 705 F.3d 884, 906 (9th Cir. 2013) ("[T]angential evidence is not material because it is insufficient to cast doubt on the ultimate result reached[.]").

Defendant speculates that Lee would have given exculpatory answers to the questions at issue. But that is highly doubtful given that defendant certainly would have offered such messages if they existed. Furthermore, the court admitted redacted exhibit 202, and defendant concedes that "other witnesses admitted to participating in the chat, and sharing information," citing Kang's testimony. (*See* AOB 35.) Thus, the jury was already aware that sharing information through the Kakao chat occurred.

Although defendant concludes this section of his argument with a broad statement that "[t]he defense should have been permitted to freely cross-examine Lee and [Yun] Shin" (*id.*), he has not challenged a single evidentiary ruling during Yun Shin's cross-examination. Indeed, defendant asked Yun Shin the same questions at issue, and he

responded in the negative.[16] That leaves only defendant's contention that Lee was the government's "star witness" and benefited substantially from his cooperation. Not so. Defendant's own inculpatory texts and violent actions caught on video were the "star witnesses." Lee's testimony was consistent with the four other victim witnesses, Lee was not present at the carjacking, and Lee did not accept the government's offer to support his application for a U Visa because he had another path to citizenship through his daughter. (2-ER-348-50.)

Thus, even assuming the district court erred, the third and fourth prongs of plain error review are not met.

## D. The District Court Did Not Clearly Err in Applying a Two-Level Enhancement Based on Its Finding That Defendant's Victims Were Vulnerable

### *1. Standard of review*

This Court reviews the district court's findings that the victims were vulnerable for clear error. *United States v. Lloyd*, 807 F.3d 1128,

---

[16] Defense counsel asked Yun Shin, "So would you be told occasionally by [defendant], 'Don't go to this club tonight; the LAPD may raid it'?" (2-ER-449.) He also asked if Yun Shin "hear[d] from others" about any raids or if Yun Shin "ever learn[ed] that a club was going to be raided." (*Id.*) Yun Shin answered no to each question. (*Id.*)

1172 (9th Cir. 2015). A factual finding is not clearly erroneous unless it is "illogical, implausible, or without support in inferences that may be drawn from facts in the record." *Hinkson,* 585 F.3d at 1262-63.

### *2. The vulnerable victim finding was logical, plausible, and supported by the record*

A two-level increase to the offense level applies "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b). The guidelines define vulnerability as being "unusually vulnerable due to age, physical or mental condition," or being "otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1(b), comment. (n.2). The district court relied on the latter phrase. (1-ER-65.)

Other courts have applied a vulnerable victim enhancement in extortion cases based on considerations similar to those cited by the district court here. For example, in *United States v. Shyllon*, the court found no clear error in applying the enhancement where a tax auditor extorted business owners by threatening audits and fines because "the victims were somewhat unfamiliar with the English language and tax enforcement in the United States." 10 F.3d at 6. And in *United States v. Bengali*, the Fourth Circuit held that an immigrant was particularly

susceptible to an extortion scheme because he lacked knowledge about American law and business practices. 11 F.3d at 1212. This Court has cited *Bengali* with approval, noting that while targeting victims of a particularly ethnicity or who speak a foreign language is generally not alone sufficient to demonstrate vulnerability, "[e]vidence that an ethnic group was particularly susceptible to [a] fraud due to lack of education, extreme insularity, superstition, or lack of familiarity with United States business practices or law enforcement might suffice to support use of § 3A1.1 against a defendant accused of swindling members of such a group." *United States v. Castellanos*, 81 F.3d 108, 112 (9th Cir. 1996) (citing *Bengali*, 11 F.3d at 1212).

Defendant argues that various factors present here, standing alone, do not support the enhancement. But, as *Castellanos* indicates, there is no hard-and-fast rule that factors such as being an undocumented immigrant, small business owner, or foreign language speaker cannot be considered under the proper circumstances or in combination with other factors. In a case involving the sale of false immigration documents and impersonating a United States official, this Court concluded that the victims "were vulnerable because (1) they

were in the United States illegally, which made [the defendant] confident they would not check on him or report him, (2) they were unfamiliar with United States immigration law, (3) they were not well educated, (4) they could not speak or read English, and (5) [the defendant] held himself out as sophisticated and knowledgeable in INS procedures." *United States v. Mendoza*, 262 F.3d 957, 960-61 (9th Cir. 2001). Relatedly, in an immigration fraud case, this Court upheld a finding of vulnerability on several factors, "including the facts that [the defendant]'s clients desired treaty investor visas but were unfamiliar with United States immigration laws and business practices; that [defendant] touted himself as a bilingual attorney capable of handling immigration matters; and that the Japanese culture places absolute trust in lawyers." *United States v. Matsumaru*, 244 F.3d 1092, 1107-08 (9th Cir. 2001). Additionally, this Court upheld a vulnerable victim enhancement where the defendant impersonated a federal officer in attempting to extort bribes from undocumented non-citizens whose status was known to immigration officials. *United States v. Solorza*, 470 F. App'x 669, 671 (9th Cir. 2012).

This Court precludes "the general application of § 3A1.1" only "in rare circumstances where . . . the victim's vulnerability is typically incorporated into the offense," such as Mann Act cases where victims "were typically economically deprived, and thus application of the adjustment would be inappropriate except under special circumstances." *United States v. Veerapol*, 312 F.3d 1128, 1133 (9th Cir. 2002). Even in Mann Act cases, however, this Court has upheld the application of the vulnerable victim enhancement based on a "high number of vulnerabilities and the depth of the individual vulnerabilities." *United States v. Chang Ru Meng Backman*, 817 F.3d 662, 671 (9th Cir. 2016).

Defendant relies on *United States v. Box*, 50 F.3d 345, 348 (5th Cir. 1995), which rejected the enhancement, but a comparison with *Box* shows why the enhancement was properly applied here. (*See* AOB 39.) In *Box*, the bail bondsman and law enforcement defendants engaged in a scheme designed to extort money (through bonds and fines) from travelers arrested at a roadside park known for homosexual activity in exchange for promises that the charges, usually public lewdness or indecent exposure, would be dropped or reduced. 50 F.3d at 348. The

Fifth Circuit rejected the government's argument that the victims were vulnerable because they were "white-collar professionals who were not local residents" and "fighting a stigmatizing 'morals' charge in a county away from home would have caused them emotional and financial problems"; in the court's view, "those alleged 'vulnerabilities' simply made the extortion possible." *Id.* at 359.

Conversely, here, defendant's victims' vulnerabilities due to their immigration status, language barriers, lack of education, and cultural isolation did more than open them up to extortion. Those factors—taken together—hindered their ability to refuse defendant. *See, e.g.*, *Backman*, 817 F.3d at 670-71 (considering the vulnerabilities in the aggregate and upholding the enhancement); *Mendoza*, 262 F.3d at 960-61 (same); *Matsumaru*, 244 F.3d at 1107-08 (same). Defendant's violent attacks and threats backed them into a corner, one without a door to law enforcement or other help.

"Because [each victim's] special characteristics as a vulnerable alien," with a weak command of the English language, being unschooled in the American legal system, and living in an insular world "are not . . . incorporated into the Specific Offense Characteristics, the district court

did not err in applying the adjustment." *Veerapol*, 312 F.3d at 1134. The sentence should be affirmed because defendant "knew or should have known that individuals with [those] backgrounds were more likely than others to succumb to the [extortion] and were particularly susceptible to the [extortion]." *United States v. Peters*, 962 F.2d 1410, 1418 (9th Cir. 1992) (affirming enhancement for fraud against individuals with poor credit histories).

## VI

## CONCLUSION

Defendant's convictions and sentence should be affirmed.

DATED: October 8, 2025

Respectfully submitted,

BILAL A. ESSAYLI
Acting United States Attorney

JOSEPH T. MCNALLY
Assistant United States Attorney
Acting Chief, Criminal Division

*/s/ Jena A. MacCabe*

JENA A. MACCABE
KEVIN J. BUTLER
Assistant United States Attorneys
Major Crimes Section

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

## STATEMENT OF RELATED CASES

The government states, pursuant to Ninth Circuit Rule 28-2.6, that it is unaware of any cases related to this appeal.

## CERTIFICATE OF COMPLIANCE

I certify that:

1. This brief complies with the length limits permitted by Ninth Circuit Rule 32-1 because the brief contains 13,824 words, excluding the portions exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word.

DATED: October 8, 2025

*/s/ Jena A. MacCabe*

JENA A. MACCABE
Attorney for Plaintiff-Appellee
UNITED STATES OF AMERICA